# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
MAY 3, 2011 Session

## RICHARD W. FELDMAN, M.D. v. TENNESSEE BOARD OF MEDICAL EXAMINERS

**Direct Appeal from the Chancery Court for Davidson County**
**No. 08-197-I     Claudia C. Bonnyman, Chancellor**

---

**No. M2010-00831-COA-R3-CV - Filed June 27, 2011**

---

This appeal arises out of disciplinary proceedings against a physician before the Tennessee Board of Medical Examiners. The Board found the physician guilty of numerous statutory and regulatory infractions, and it assessed a monetary penalty against the physician and revoked his license for at least one year. The physician filed a petition for review in chancery court, and the chancery court affirmed the decision of the Board. The physician appeals, challenging the Board's decision on numerous grounds. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Donald Capparella, Nashville, Tennessee, for the appellant, Richard W. Feldman, M.D.

Robert E. Cooper, Jr., Attorney General and Reporter, Sara E. Sedgwick, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Board of Medical Examiners

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

Richard W. Feldman, M.D. ("Dr. Feldman") was licensed to practice medicine in Tennessee in 1976.  He practices under the business name "Doctors' Diet Program."  In 2004, Dr. Feldman began advertising his practice via billboards, newspaper advertisements, and two Internet websites.  Dr. Feldman's websites described him as "Tennessee's most experienced weight loss physician" and contained a heading which stated, "Tennessee's #1 Diet Program."

Dr. Feldman maintained a website called smallerclothes.com for advertising his diet program, and he used a website called doctorsantiaging.com for advertising a procedure that he performed called mesotherapy.  Dr. Feldman's mesotherapy website stated that mesotherapy involved the injection of medications into a person's skin to "melt fat cells," and his advertisements basically described mesotherapy as "Fat Melting Shots."  The website claimed that the "liquefied fat" would be "either utilized as energy or simply excreted by the body."  Dr. Feldman advertised that mesotherapy was effective for "spot weight reduction," cellulite reduction, and weight loss, among other things.  He claimed that "One pound of fat per week on average is lost – equal to four sticks of butter!"  He further claimed that a "typical patient" could lose up to two dress sizes with ten treatments, and that patients had "lost up to four inches on their waist, hips, and thighs."  Dr. Feldman's website described mesotherapy as "safe and effective" with "no significant side effects," and it stated that "[t]he Mesotherapy medications . . . have been Food and Drug Administration (FDA)-approved."

On June 2, 2006, a "Notice of Charges" was filed against Dr. Feldman before the Tennessee Board of Medical Examiners by the Tennessee Department of Health, Division of Health Related Boards ("the State").[1]  The Notice of Charges detailed various statements and claims made in Dr. Feldman's advertisements.  It then alleged that there have been no well designed clinical studies to suggest that a patient can achieve meaningful weight loss or reduce waist circumference or dress size by undergoing mesotherapy.  The Notice of Charges further alleged that there have been no safety studies, no meaningful efficacy or outcome studies, and no randomized prospective blinded clinical trials of mesotherapy.  Based on these allegations, the State's Notice of Charges alleged that Dr. Feldman had violated numerous provisions of the Tennessee Medical Examiners Practice Act, including

---

[1]  The Tennessee Board of Medical Examiners is responsible for conducting disciplinary hearings, Tenn. Code Ann. § 63-6-101(a)(3), and disciplining licensees.  Tenn. Code Ann. § 63-6-214(a).  All proceedings for disciplinary action against a licensee are conducted in accordance with the Uniform Administrative Procedures Act.  Tenn. Code. Ann. § 63-6-216.

several subsections of Tennessee Code Annotated section 63-6-214(b): unprofessional, dishonorable, or unethical conduct; making false statements or representations or being guilty of fraud or deceit in the practice of medicine; willful violation of the rules and regulations promulgated by the board of medical examiners regarding advertising by practitioners; violation of the provisions of Tennessee Code Annotated Title 63, Chapter 6, or lawful orders of the board issued pursuant thereto; gross or repeated malpractice or ignorance, negligence, or incompetence in the course of medical practice; and dispensing any drug not in the course of professional practice or not in good faith or not to cure an ailment or when medically necessary. The Notice of Charges further alleged that Dr. Feldman had violated several regulations adopted by the board of medical examiners regarding advertising by licensees, by claiming that his services were professionally superior to others or that one licensee was better than another when superiority of services could not be substantiated; by using data or information based on past performances to predict future services, creating an unjustified expectation about results; by misrepresenting material facts; by misrepresenting a licensee's credentials, training, experience, or ability; and by communicating in a manner to create unjustified expectations concerning potential results of treatments. *See* Tenn. Comp. R. & Regs. § 0880-2-.13(4).

Contested case proceedings took place before the Board of Medical Examiners ("the Board") over the course of three days, and the parties presented the testimony of several expert witnesses. The Board ultimately concluded that Dr. Feldman had violated all of the aforementioned statutes and regulations with the exception of the malpractice charge and the charge of dispensing medication when not medically necessary. The Board determined that Dr. Feldman's license to practice medicine in the State of Tennessee should be revoked for a period of not less than one year, and that he should pay a $100 penalty for each of the 413 patients upon whom he had performed mesotherapy, for a total of $41,300, in addition to the costs of prosecution of the matter.

Dr. Feldman then filed a petition for judicial review in the chancery court of Davidson County in accordance with Tennessee Code Annotated section 4-5-322. He alleged that the administrative law judge ("ALJ") utilized unlawful procedures by improperly excluding certain testimony from his expert witnesses and by improperly admitting evidence of his previous disciplinary actions before the Board.[2] Dr. Feldman further alleged that the Board's decision was arbitrary and capricious and unsupported by substantial and material evidence. After reviewing the administrative record, the chancery court affirmed the Board's final

---

[2] "It is the duty of the administrative judge or hearing officer to preside at the hearing, rule on questions of the admissibility of evidence, swear witnesses, advise the agency members as to the law of the case, and ensure that the proceedings are carried out in accordance with the provisions of this chapter, other applicable law and the rules of the respective agency." Tenn. Code Ann. § 4-5-301(b).

order, finding that the ALJ rightly excluded the testimony from Dr. Feldman's experts, that consideration of Dr. Feldman's disciplinary history was not arbitrary or improper, that substantial and material evidence supported the Board's findings regarding the violations, and that the penalties imposed were not arbitrary or capricious. Dr. Feldman then appealed to this Court.

## II. ISSUES PRESENTED

Dr. Feldman presents the following issues, slightly restated, for review on appeal:

1. Whether the Board's finding that Dr. Feldman committed violations by engaging in false and misleading advertising is unsupported by substantial and material evidence in light of the entire record;
2. Whether the ALJ abused her discretion by excluding relevant testimony from Dr. Feldman's experts because they were not familiar with the standards in Tennessee for fraud, misrepresentation, and medical advertising;
3. Whether the ALJ abused her discretion by excluding testimony from Dr. Feldman's experts on the basis of the contiguous state licensure requirement in Tennessee Code Annotated section 29-26-115; and
4. Whether the Board unlawfully disregarded the ALJ's instructions regarding the consideration of prior disciplinary charges and effectively "re-punished" Dr. Feldman for the past offenses.

For the following reasons, we affirm the decision of the chancery court and that of the Board.

## III. STANDARD OF REVIEW

"Judicial review of decisions of administrative agencies, when those agencies are acting within their area of specialized knowledge, experience, and expertise, is governed by the narrow standard contained in Tenn. Code Ann. § 4-5-322(h) rather than the broad standard of review used in other civil appeals." *Roy v. Tenn. Bd. of Med. Examiners*, 310 S.W.3d 360, 363 (Tenn. Ct. App. 2009). Pursuant to Tennessee Code Annotated section 4-5-322(h), this Court may only reverse or modify the Board's decision if Dr. Feldman's rights were prejudiced because the Board's findings, inferences, conclusions or decisions were:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the

light of the entire record.

    (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

In addition, "[n]o agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision." Tenn. Code Ann. § 4-5-322(i).

## IV. DISCUSSION

### A. Evidence before the Board

First, we will address Dr. Feldman's contention that the Board's findings of violations based on false and misleading advertising were not supported by substantial and material evidence in light of the entire record.

During Dr. Feldman's testimony before the Board, he testified that he claimed in his advertisements to be "Tennessee's most experienced weight loss physician" and to have "Tennessee's #1 Diet Program" due to the length of time that he had been practicing, the number of patients that he had treated, and the fact that other doctors asked him for advice and referred to him as "the guru." Dr. Feldman testified that he started practicing in the area of weight loss in 1983, and that in 1995, he "started coming out of family practice and directing [his] energies more towards weight loss treatment." Dr. Feldman said that he had counted his patient records and determined that he had "treated and/or supervised" 40,000 patients. Dr. Feldman said that he did not claim that he was the most experienced weight loss physician in Tennessee until after the death of one of his colleagues who had been practicing since 1947. He said he would concede that he was not the most experienced weight loss physician in Tennessee "if somebody came forward and showed me that they had more patients they treated for obesity."

Dr. Feldman described mesotherapy as the subcutaneous injection of a solution into areas of "spot fat that needed to be reduced," such as the "love handles" or "a double chin," whereby the injected solution causes damage, or necrolysis, to the fat cells. According to Dr. Feldman's testimony, after mesotherapy, the weight of the fat in the injected area would either be "dissipated out in the rest of your body where it's not as noticeable," or, if the patient was also following a ketogenic diet, the weight would be secreted from the body. In other words, he said, "the weight is disappearing out of that spot." Dr. Feldman said the average mesotherapy patient would be injected with five to ten syringes of solution, with

twenty to thirty injections per syringe. He testified that he had performed about 700 mesotherapy procedures on approximately 413 patients.

Dr. Feldman admitted that mesotherapy was "not for overall weight [loss]" and that it would not cause generalized weight loss. However, he testified that he had never claimed or told people that mesotherapy would result in significant weight loss or total body weight loss, and that he had never used mesotherapy for overall weight loss. Dr. Feldman pointed out that his mesotherapy advertisements "never said general weight reduction" and did not state that weight would be "gone from the body" after mesotherapy. Nevertheless, Dr. Feldman testified that weight would be gone from the body if the patient was following a ketogenic diet. Dr. Feldman explained that the way to achieve overall weight loss was through diet, behavior modification, and exercise. He said that he used mesotherapy strictly for "spot fat reduction," also known as "spot weight reduction," and in less than one percent of his patients, he used it to treat cellulite. He explained "spot weight loss" as "the weight loss you might achieve in your chin" or another treated area. Dr. Feldman also claimed that mesotherapy would help patients to lose weight by providing them with motivation to follow their diet, but he again insisted that he always put his patients on a ketogenic diet in order for them to achieve overall weight loss.

Dr. Feldman testified that he advertised mesotherapy with the phrase "fat melting shots" because the public would not understand if his advertisements referred to "injections in the subcutaneous areas to help necrotize the fat so that macrophages can perform phagocytosis." He claimed that the phrase "melting the fat" was an accurate way of describing mesotherapy in layman's terms. Dr. Feldman suggested that physicians routinely break down medical explanations to patients by picking out the best terms, not to mislead them, but to help them visualize. He said that physicians are taught to provide these simple explanations in medical school. Dr. Feldman insisted that the claim on his mesotherapy website about losing one pound of fat per week, equal to four sticks of butter, was an accurate statement regarding the results to be obtained from spot fat reduction. He said, "The reason for the four sticks of butter, once again, is for a layperson to visualize." Dr. Feldman also insisted that his claim about losing two dress sizes with ten treatments was accurate. When asked about the accuracy of his claim that mesotherapy patients could lose two to six inches in their saddle bags, love handles, hips, thighs, waist, back fat, and chin, Dr. Feldman again insisted that this was an accurate statement. However, when asked to elaborate, Dr. Feldman clarified that such results could be achieved with the ketogenic diet that he required his mesotherapy patients to follow. Dr. Feldman acknowledged that the claim about losing inches was made on his mesotherapy website under a heading entitled, "Mesotherapy." He was then asked to point out where his website mentioned the diet that would allegedly achieve the loss of inches, and he pointed to the phrase "Doctors Diet Program," which was the name of his practice. He said that any reasonable person looking at his website should

understand that because it comes from "Doctors Diet Program," there would also be a diet administered by a doctor.

Dr. Feldman admitted that the claims used in his advertising had not been approved by the FDA, and that the combination of drugs that he used in mesotherapy had not received FDA approval. When asked who had established that mesotherapy was "safe," as claimed in his ads, Dr. Feldman generally mentioned a study that an "expert" plastic surgeon in Colorado had published regarding "safety methods that she studied." Dr. Feldman acknowledged that the informed consent and disclaimer form he required his mesotherapy patients to sign stated that "the procedure is a relatively new procedure and that little is known about its long term safety[.]" It stated that side effects could include "pain, discomfort, tingling, burning, swelling, bruising, all of which may be temporary o[r] could possibly be permanent" and "might be difficult to tolerate." The disclaimer form also stated that "there are numerous risks and complications, both known and unknown, connected with the procedure. These can include, but not be limited to: infection that can be localized or could spread throughout the body, hemorrhage or bleeding, delayed healing, under or over correction and other risks that are not known at this time." Although Dr. Feldman's website stated that "[t]he Mesotherapy medications . . . have been Food and Drug Administration (FDA)-approved," his disclaimer form stated that "(PPC) injections are NOT approved by the Federal Drug Administration (FDA) [sic] for ANY type of human benefit."

Regarding the allegation that there had been no double blind studies of mesotherapy, Dr. Feldman testified that one of his colleagues conducted a double blind study that had been published. Upon further questioning, however, Dr. Feldman clarified that there was no control group used in the study and that it simply compared the use of mesotherapy by injecting a combination of two drugs with the use of one drug alone. He said, "Everybody knew it worked. They just wanted to see which part worked better . . . ."

The Board heard testimony from numerous expert witnesses as well. The Board heard live testimony from Kevin Niswender, M.D., Ph.D., on behalf of the State. Dr. Niswender was licensed to practice medicine in Tennessee, he held a Ph.D. in physiology and metabolism, and he served as a faculty member in the Department of Medicine at Vanderbilt University in the Division of Diabetes, Endocrinology, and Metabolism. Dr. Niswender testified that he had never performed mesotherapy or seen it performed. However, he had reviewed documents and performed a literature search concerning the medical feasibility of using mesotherapy for weight loss. He testified that to the best of his knowledge, he had read "the entirety of the literature that's been published in the public domain" regarding mesotherapy, although he acknowledged that the published literature on mesotherapy was very limited. Dr. Niswender testified that he was unable to find any evidence in favor of the hypothesis that subcutaneous injections of mesotherapy could induce weight loss. He said

that there was no evidence to support the efficacy of mesotherapy for weight loss or for cellulite reduction, and that the implication that patients could experience meaningful weight loss from subcutaneous injections into fat was not consistent with current scientific understanding. He testified that the standard of care for weight loss would be a prescribed diet, and that there was no evidence that the addition of mesotherapy to the diet would result in any additional benefit. When asked about Dr. Feldman's use of mesotherapy for "spot weight reduction," Dr. Niswender testified that the concept of spot weight reduction was "not a medically relevant term that I'm familiar with or that I could even define for you." Dr. Niswender explained that if mesotherapy was injected into an area such as the chin, there would not necessarily be any weight loss as a result.

Regarding Dr. Feldman's advertising claim that mesotherapy could "melt fat," Dr. Niswender explained that the mechanism of mesotherapy is actually necrosis in the fat tissue. He said, "This is not melting of the fat, which would imply a high temperature such that the fat became soluble. The biosalts actually induce tissue damage and necrosis of the fat tissue." Thus, Dr. Niswender stated that the phrase "fat melting shots" was not a reasonable statement from a medical weight loss perspective. Dr. Niswender testified that it was certainly conceivable that injections of mesotherapy could cause damage to the tissue, and that there was the theoretical potential for adverse reactions to fat necrosis due to the tissue damage.

The Board also heard affidavit and deposition testimony from Gordon Lee Jensen, M.D., Ph.D., who testified on behalf of the State. Dr. Jensen was licensed to practice medicine in Tennessee and held his doctoral degree in nutritional biochemistry, and he served as the Director of the Vanderbilt Center for Human Nutrition. Dr. Jensen testified that he had never performed mesotherapy and that he was not aware of any respected physicians who did perform it. He stated that he had performed a comprehensive review of the published medical literature regarding mesotherapy for weight reduction, and that his research revealed no safety studies, no meaningful efficacy or outcome studies, and no randomized prospective blinded clinical trials. Dr. Jensen further stated that he was unable to identify any well designed clinical studies that would suggest that patients could achieve or maintain meaningful weight loss or reduce their waist circumference or dress size with mesotherapy. Dr. Jensen stated that Dr. Feldman had specifically marketed mesotherapy as weight loss intervention without disclosing that the weight reduction he claimed to be possible would require a multi-month diet and exercise program. He testified that it was not appropriate to perform mesotherapy as part of a weight loss program. Dr. Jensen also testified that he was not aware of a medical term known as "spot fat reduction" as part of standard weight reduction therapy.

Dr. Feldman presented the deposition testimony of Phillip R. Langsdon, M.D., who was licensed to practice medicine in Tennessee and Arkansas and served as chief of the Division of Facial Plastic Surgery at the University of Tennessee Health Science Center in Memphis. Dr. Langsdon testified that he had attended a training session in the field of mesotherapy, read much of the available literature on the subject, and undergone mesotherapy treatment himself. He said he knew of several other physicians in the Memphis area who had performed mesotherapy. Dr. Langsdon stated his opinion that mesotherapy was a safe and effective treatment in many patients for the reduction of fat in those areas to which it is applied. However, he said that he had no experience with the use of mesotherapy for uses other than "spot fat reduction" and that he did not feel comfortable rendering an opinion regarding its safety or efficacy for other uses. Dr. Langsdon said that he had reviewed Dr. Feldman's advertisements and found them to be "okay."

Dr. Feldman also presented the deposition testimony of Timothy Boehm, M.D., who was licensed to practice medicine in Arkansas. Dr. Boehm testified that mesotherapy was widely available and helpful for spot weight reduction, and that it could have a favorable cosmetic effect on local problems with fat or cellulite. However, he clarified that "it's not a therapy for total weight reduction," and that diet and exercise programs were appropriate for that purpose. Dr. Boehm explained that if a 200-pound person received mesotherapy for spot weight reduction on his double chin, there would be a cosmetic change in the amount of fat in the area, but there would not be any significant difference in the patient's total weight in pounds on the scale, unless he was dieting. He said that the issue of weight loss would depend on whether the fat was excreted out of the body or simply deposited at another source. Dr. Boehm also acknowledged that any evidence that such fat passes out of the body is not scientifically conclusive at this point.

Dr. Boehm testified that the phrase "fat melting shots" was an oversimplification designed to appeal to patients. He conceded that it was not the most accurate or scientific way to describe mesotherapy but noted that advertisements have to be understandable. Regarding the statement on Dr. Feldman's website that mesotherapy was being used everyday by physicians around the world for a variety of purposes, including overall weight loss, spot weight loss, spot weight reduction, hair loss, scar revision, improvement of skin quality, and wrinkle reduction, Dr. Boehm testified that this statement was "overly optimistic" and "surely something that deserved editing." Another claim on Dr. Feldman's website was that healthy adults ages 18 to 75 were candidates for mesotherapy "for weight loss, spot weight reduction, and cellulite reduction." Dr. Boehm testified that this statement was ambiguous, and that Dr. Feldman should have differentiated between total weight loss and localized weight loss or simply referred to mesotherapy's use for "spot weight reduction" without mentioning cellulite reduction.

Next, Dr. Feldman presented the deposition testimony of Roman A. Chubaty, M.D., who was licensed to practice medicine in Arizona and the province of British Columbia in Canada. He testified that the nature of his practice was aesthetic medicine, which he described as "the practice of making people feel better about themselves so they can look better." He said his practice included such things as mesotherapy and Botox fillers, and that he had been practicing mesotherapy for about four years. Dr. Chubaty considered himself to be the top North American expert in mesotherapy. He testified that he trains other physicians in the practice of mesotherapy, and that he had trained about ten Tennessee physicians on its use. Dr. Chubaty was asked whether mesotherapy is a therapy for weight loss, to which he responded, "It's a therapy for spot fat reduction." He explained that mesotherapy could be used for weight loss if the patients were on a diet in order to help them achieve "more firm contour results" or encourage them to stick with a diet program. Dr. Chubaty testified that he used mesotherapy in conjunction with a diet, but that he did not use mesotherapy for weight loss. He also testified that mesotherapy was an effective treatment for cellulite.

Dr. Chubaty testified that it was incorrect to state that there had been no safety studies, no randomized prospective blinded clinical trials, and no well designed clinical studies to suggest that a patient can reduce waist or breast size with mesotherapy, although he admitted that there were no well designed clinical studies to suggest that mesotherapy causes meaningful weight loss. Dr. Chubaty testified that he had reviewed Dr. Feldman's advertisements and the Notice of Charges filed against Dr. Feldman regarding the statements made in the advertisements, and in his opinion, the claims made by Dr. Feldman were not fraudulent or misleading and did not constitute false statements or representations. However, regarding Dr. Feldman's specific advertising claim that an average patient would lose one pound of fat per week, Dr. Chubaty said that while it might be "possible" for a patient to lose one pound per week with mesotherapy, those would not be the results for an "average" patient.

Finally, Dr. Feldman presented the deposition testimony of Adam Michael Rotunda, M.D., who was licensed to practice medicine in California. Dr. Rotunda opined that mesotherapy is medically efficacious for the purpose of reducing localized fat tissue. However, he said that he could not generalize and say that mesotherapy results in weight loss. Dr. Rotunda said that the patient would have to be under some negative energy balance condition for weight loss to occur. Dr. Rotunda was board-certified in the field of dermatology, and he stated that he did not have expertise in medical weight loss. He also said that he did not use mesotherapy in practice for weight loss. When asked what would happen to the targeted fat if the mesotherapy patient was also following a ketogenic diet, Dr. Rotunda said that his "best guess" would be that the fat "would probably be redistributed in the body and a portion of that would be excreted."

-10-

Dr. Rotunda opined that mesotherapy is safe with proper patient selection and when the dosage reported in the literature is given. Dr. Rotunda testified that he had seen twenty to twenty-five peer-reviewed papers regarding mesotherapy that contained "safety components." He said there were two relatively recent double blinded reports on mesotherapy, one of which had been "e-published," and the other was still in the peer review process. Dr. Rotunda stated that to his knowledge, there were no peer-reviewed publications looking at mesotherapy and cellulite, but he noted that some physicians were using mesotherapy to reduce cellulite.

Dr. Rotunda testified that he had reviewed Dr. Feldman's advertisements, and he stated his opinion that the ads did not make any false promises. With regard to the phrase "fat melting shots," Dr. Rotunda explained that "melting" was a lay term used to make the ads more understandable because patients probably would not understand terms like "lipolysis, ablation, [or] necrosis," which would truly describe the mechanism of mesotherapy. He acknowledged there are "very few procedures in medicine which melt, per se." As for the other advertising claims, Dr. Rotunda testified that losing two dress sizes over the course of ten mesotherapy treatments would be a reasonable expectation if the patient was also following a ketogenic diet. Dr. Rotunda also stated that an average person could lose one pound of weight per week if mesotherapy were used in combination with a weight loss diet. He explained that it is the diet prescribed by Dr. Feldman that results in weight loss in his patients rather than the use of mesotherapy. Dr. Rotunda testified that comparing a one-pound weight loss to four sticks of butter was a reasonable illustration for a lay person. He agreed with the suggestion that the lay public does not appreciate medical terms, so the idea is to express things in everyday language.

The Board made the following findings of fact in this case:

1.     Respondent has been at all times pertinent hereto licensed by the Board as a medical doctor in the State of Tennessee[.]
2.     Respondent claims to be "Tennessee's most experience[d] weight loss physician" and to have "served" over 40,000 patients.
3.     Between June of 2004 and March of 2006, Respondent has advertised and provided treatment using mesotherapy in a process now referred to as lipodissolve.
4.     Respondent utilized mesotherapy for the purpose of weight reduction to four hundred thirteen patients.
5.     Respondent advertised that he was utilizing mesotherapy for the purpose of weight reduction.
6.     Respondent advertised his use of mesotherapy as a treatment for "cellulite reduction, spot weight reduction, and skin rejuvenation."

-11-

7. Respondent advertised that "[m]esotherapy is by far the most successful of all current cellulite treatments available today."

8. Respondent advertised that mesotherapy was "safe."

9. Respondent advertised that mesotherapy "dissolves fat gradually."

10. Respondent advertised that mesotherapy "reduces and even removes cellulite."

11. Respondent advertised that mesotherapy results will be "one pound of fat per week on average is lost – equal to four sticks of butter!"

12. Respondent advertised that mesotherapy "permanently eliminates dimpling and misshapen fat under the skin."

13. Respondent advertised that "[a] typical patient can lose up to two dress sizes with ten treatments."

14. Respondent advertised that the medications used in mesotherapy "melt the fat beneath the skin and shrink the fat cells in the scarpa's fascia layer. The fat dissolves and, as occurs when fat is broken down during typical weight loss, is carried through the bloodstream and excreted by [the] kidneys and bowel. The medications used in mesotherapy destroy the connective tissue bands and melt the trapped fat, creating a smooth, dimple-free appearance."

15. Respondent advertised on his website, doctorsantiaging.com, from at least September 29, 2004 until on or about May 24, 2005, that "mesotherapy also has a variety of medicinal uses. Treatments can benefit those suffering from muscle spasms, stress, insomnia, carpal tunnel syndrome, fibromyalgia, infections, RSD (Reflex sympathetic dystrophy), and osteoarthritis, among other" uses. Respondent's website currently states that mesotherapy "is a non-surgical injection technique with a broad range of applications."

16. Mesotherapy now referred to as lipodissolve is not currently recognized as the standard of care for weight reduction.

17. There have been no randomized prospective blinded clinical trials of mesotherapy[.]

18. There have been no meaningful efficacy/outcome studies of mesotherapy[.]

19. There have been no safety studies of mesotherapy[.]

20. There have been no well designed clinical studies that suggest that meaningful weight loss or reduction in waist circumference or dress size can be achieved or maintained by mesotherapy[.]

On appeal, Dr. Feldman first challenges what we find to be a technical aspect of the Board's order. After the Board set forth the twenty findings of fact listed above in Section

I of its order, the Board stated that "[t]he facts in Section I of this Final Order are sufficient to establish violations by the Respondent of the following statutes or rules . . . ." The order then stated that "[t]he facts in paragraphs 2 through 16, *supra*, constitute a violation of" each of the specific statutes and regulations. Dr. Feldman argues on appeal that because this section of the order did not specifically incorporate the findings of fact numbered 17 through 20, this "necessarily means several other findings of fact are unsupported by the record." For example, he argues that factual finding number 8, which stated that Dr. Feldman advertised mesotherapy as "safe," is now unsupported by the record because "the only finding of fact to suggest that Dr. Feldman's claim of safety was false or misleading was Finding No. 17 not relied upon by the Panel." We disagree with this assertion and refuse to give effect to form over substance in reviewing the Board's order. The Board made twenty specific findings of fact and stated that those facts established the violations committed by Dr. Feldman. We will not simply ignore the last four factual findings, as if they were never made, simply because the Board inexplicably failed to incorporate them into the subsequent portion of its order.

Now, we will turn to Dr. Feldman's substantive challenges to the Board's factual findings. In reviewing the evidence, we keep in mind that the substantial and material evidence standard requires something less than a preponderance of the evidence but more than a scintilla or glimmer. *Dickson v. City of Memphis Civil Serv. Comm'n*, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005); *Mosley v. Tenn. Dep't of Commerce & Ins.*, 167 S.W.3d 308, 316 (Tenn. Ct. App. 2004). Courts may not reweigh the evidence or substitute their judgment for the Board's, even if the evidence could support a conclusion different from the one reached by the Board. *Miller v. Civil Serv. Comm'n of Metropolitan Gov't of Nashville & Davidson County*, 271 S.W.3d 659, 665 (Tenn. Ct. App. 2008). "We may reject the Board's decision only if a reasonable person would necessarily reach a different conclusion based on the evidence. It is not enough that the facts could support a different conclusion." *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 265 (Tenn. 2009) (citing *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001)). In other words, we "review the record for such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Miller v. Tennessee Bd. of Nursing*, 256 S.W.3d 225, 229 (Tenn. Ct. App. 2007) (citing *Clay County Manor, Inc. v. State*, 849 S.W.2d 755, 759 (Tenn. 1993); *S. Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984); *Papachristou v. Univ. of Tenn.*, 29 S.W.3d 487, 490 (Tenn. Ct. App. 2000)).

On appeal, Dr. Feldman argues that there is a "lack of evidence" to support many of the Board's findings of fact. However, Dr. Feldman does not dispute that he made each of the aforementioned statements in his advertising. Instead, he basically argues that such claims were not false or deceptive, and therefore, they should not provide a basis for finding him in violation of the various statutes and regulations cited by the Board. Having carefully

reviewed the entire record, we find that substantial and material evidence supports each of the Board's factual findings listed above, and we also find a reasonably sound basis for the Board's conclusion that Dr. Feldman violated each of the cited statutes and regulations. All of the experts basically agreed, and Dr. Feldman himself conceded, that mesotherapy does not cause generalized weight loss. Although Dr. Feldman claimed that "the weight is disappearing out of that spot," he testified that the weight would either be "dissipated out in the rest of your body where it's not as noticeable," or, *if* the patient was also following a ketogenic diet, the weight would be secreted from the body. Dr. Feldman's advertisements simply claimed in many instances that mesotherapy would achieve "weight loss." For example, his website stated, "Repair and restore your face and body with injections under the skin for effective cellulite reduction, weight loss, and facial rejuvenation." It described the mesotherapy medications as "ingredients for cellulite reduction, weight loss and body sculpting." The website further stated that healthy adults ages 18 to 75 were "candidates for Mesotherapy for weight loss, spot weight reduction, and cellulite reduction." It further claimed that mesotherapy was being used around the world for "a variety of purposes, including overall weight loss, spot weight loss, spot weight reduction," and other uses. Dr. Feldman's website even claimed that mesotherapy patients would lose an average of one pound per week, or two dress sizes with ten treatments. From our review of the record, Dr. Feldman's mesotherapy website did not inform readers that the weight loss he described could only be achieved with a diet program that is separate and apart from mesotherapy. Dr. Feldman admitted that he advertised mesotherapy on one website and used a separate website "for the diet program." He also described mesotherapy as safe and stated that the mesotherapy medications were FDA-approved, when he later admitted that the FDA had not approved the combination of medications, and Dr. Feldman's own consent form stated that little is known about the long term safety of mesotherapy and that there were numerous risks, complications, and side effects, both known and unknown. In sum, despite Dr. Feldman's contention that the Board's decision lacked evidentiary support, we find it is supported by "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Miller*, 256 S.W.3d at 229.

We note that Dr. Feldman specifically attacks the Board's finding that he advertised and used mesotherapy "for the purpose of weight reduction." Dr. Feldman argues that this was error because he testified that he used mesotherapy only for "spot weight reduction" and not for overall weight reduction. We note that the Board's finding does not specify whether it was referring to spot weight reduction or overall weight reduction. Because Dr. Feldman clearly advertised the use of mesotherapy simply for "weight loss" purposes, without clarification, we cannot say that the Board erred in its finding that Dr. Feldman advertised and used mesotherapy simply for "weight reduction."

Dr. Feldman also argues that the testimony of Drs. Niswender and Jensen, who testified on behalf of the State, should have been given little weight because they had never performed mesotherapy, and they had only researched the issue. However, Dr. Niswender testified live before the Board, and we give great weight to an administrative body's credibility determinations when it has conducted a hearing and evaluated witnesses as they testified. *City of Memphis v. Civil Service Comm'n of City of Memphis*, 238 S.W.3d 238, 243 (Tenn. Ct. App. 2007). In addition, we note that Dr. Niswender was licensed to practice medicine in Tennessee, held a Ph.D. in physiology and metabolism, and served as a faculty member in the Department of Medicine at Vanderbilt University in the Division of Diabetes, Endocrinology, and Metabolism. Dr. Jensen was licensed to practice medicine in Tennessee, held a doctoral degree in nutritional biochemistry, and served as the Director of the Vanderbilt Center for Human Nutrition. As such, we are unable to conclude that the Board erred in crediting at least portions of the testimony of these highly trained physicians. Finally, we note that we find Dr. Feldman's argument simply unconvincing. Because Drs. Niswender and Jensen were of the opinion that mesotherapy is not an accepted or appropriate treatment, it is obvious that these physicians would not regularly perform mesotherapy on their patients. Notwithstanding their lack of personal experience practicing mesotherapy, however, we conclude that Drs. Niswender and Jensen demonstrated a sufficient basis of knowledge for their opinions on the issue.

Dr. Feldman also challenges the Board's factual findings regarding his advertisements of mesotherapy for the treatment of cellulite. For example, the Board found that Dr. Feldman advertised that mesotherapy "is by far the most successful of all current cellulite treatments available today," and he claimed that it "permanently eliminates dimpling and misshapen fat under the skin." Dr. Feldman argues on appeal that "no state witness provided any testimony" to suggest that his advertisements about the use of mesotherapy for cellulite were false or misleading. However, Dr. Niswender did testify that he had found no evidence to support the hypothesis that mesotherapy reduces cellulite. In addition, one of Dr. Feldman's own experts, Dr. Rotunda, testified that to his knowledge, there were no peer-reviewed publications looking at mesotherapy and cellulite. When asked if mesotherapy is a permanent solution for cellulite, Dr. Chubaty testified that "at the time it's a permanent destruction of the fat cell," but he suggested that the cellulite would return with age, or if the person gained weight. We find that this evidence provides a reasonably sound basis for the Board's conclusion that Dr. Feldman's claims regarding cellulite were deceptive.

Dr. Feldman next challenges the Board's finding regarding his claim to be "Tennessee's most experienced weight loss physician," pointing out that there was no proof that another doctor had treated more patients or was more experienced. We find that such proof was not necessary, however, as the Board's regulation states that it is unethical and unprofessional conduct to "convey the message that one licensee is better than another *when*

*superiority* of services, personnel, materials or equipment *cannot be substantiated*." Tenn. Comp. R. & Regs. § 0880-02-.13(4)(a) (emphasis added). From our reading of the regulation, a violation occurs when a licensee makes a claim regarding superiority that cannot be substantiated, and we find that Dr. Feldman did not substantiate his advertising claim simply by testifying that he had practiced in weight loss since 1983 and served 40,000 patients. These facts, standing alone, do not demonstrate that he is the most experienced weight loss physician in Tennessee. Thus, we find substantial and material evidence to support the Board's finding of fact regarding this issue.

Finally, Dr. Feldman challenges the Board's order because one of the factual findings stated that his website "currently states" a certain description regarding mesotherapy, whereas the other factual findings used the term "advertised," in the past tense. Dr. Feldman argues that the undisputed proof showed that he took his website down not long after the Notice of Charges was filed against him in June of 2006, so that it was error for the Board to find that his website currently stated anything at the time of the entry of its order. However, we cannot say that this single misstatement affected the merits of the Board's decision. Under the UAPA, "[n]o agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision." Tenn. Code Ann. § 4-5-322(i).

In sum, we reject each of Dr. Feldman's arguments challenging the sufficiency of the evidence before the Board, and we find substantial and material evidence to support the Board's decision.

## B. Exclusion of Testimony

### 1. Testimony regarding Dr. Feldman's Advertising

Next, we will address Dr. Feldman's contention that the ALJ abused her discretion by excluding testimony from two of Dr. Feldman's experts because they were not familiar with the standards for fraud, misrepresentation, or medical advertising in Tennessee.[3] Dr.

---

[3] Although the UAPA does not clearly specify the standard to be used to review decisions regarding the admission or exclusion of evidence, we have previously determined that they should be reviewed using the same standard used to review similar decisions by trial judges – the abuse of discretion standard. *See Tenn. Dep't of Health v. Frisbee*, No. 01A01-9511-CH-00540, 1998 WL 4718, at *2 (Tenn. Ct. App. M.S. Jan. 9, 1998). "The "abuse of discretion" standard of review implicitly recognizes the existence of a range of permissible judicial decisions and is intended to be a review constraining concept that implies less intense appellate review and, therefore, less likelihood of reversal." *Id.* (citing *BIF v. Service Constr. Co.*, App No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988)). We will not overturn a discretionary

(continued...)

Feldman complains that the following deposition testimony from Dr. Chubaty was excluded:

> Q.　　Do you feel that the advertising from a medical perspective is misleading or inappropriate in any way?
>
> Counsel for the State:　　Objection to inappropriate opinion.
> Counsel for Dr. Feldman:　You may answer.
>
> A.　　I believe it uses lay terms to use the term "melting fat," whereas possibly emulsification of fat or dissolving may be too hard to grasp for certain people. So that would be appropriate if you're trying to capture the general public, yes.
>
> Q.　　Well, why not use medical terminology in such advertisements?
>
> Counsel for the State:　　Again, object. Same objection.
> Counsel for Dr. Feldman:　You may answer.
>
> A.　　Well, the lay public most of the time isn't aware of what you're trying to convey to them unless you give it in more simple terms. . . . So such a term as we're going to inject something to emulsify your fat, they wouldn't understand, melt fat quicker than emulsify.

The State argued that this constituted improper opinion testimony because Dr. Chubaty conceded that he had no expertise in the areas of medical ethics, fraud, misrepresentation, or medical advertising in Tennessee, and the State claimed that it was up to the Board to decide whether the advertising was "appropriate" pursuant to its regulations. In response, counsel for Dr. Feldman argued that Dr. Chubaty should be permitted to testify about the procedure of mesotherapy. The ALJ acknowledged that Dr. Chubaty possessed knowledge about the procedure of mesotherapy, but she concluded that Dr. Chubaty was not simply testifying about the science of the procedure in this line of questioning. Instead, she found that he was testifying about whether he thought the advertising was "appropriate." The ALJ noted that advertising standards differ from state to state, and Dr. Chubaty practiced medicine in Arizona. Ultimately, the ALJ stated that it was up to the Board to interpret and apply its own rules, and she excluded the two questions and answers quoted above.

---

[3](...continued)
decision simply because we would not have made the same decision, but we may overturn the decision if it rests on an inadequate evidentiary foundation or if it is contrary to the applicable legal principles. ***Id.***

We find that it was not an abuse of the ALJ's discretion to exclude this line of questioning regarding whether Dr. Chubaty felt that Dr. Feldman's advertisements were appropriate, when he admitted that he had no expertise in the area of medical advertising in Tennessee. Although the ALJ prohibited Dr. Feldman from reading these two questions and answers from Dr. Chubaty's deposition, he was not prevented from using other portions of Dr. Chubaty's testimony regarding the science of mesotherapy and the fact that mesotherapy "kills" fat cells. In addition, the Board heard Dr. Chubaty's testimony that he had reviewed Dr. Feldman's advertisements, including the claims that mesotherapy "dissolves fat gradually" and "melt[s] the fat," and Dr. Chubaty stated his opinion that these did not constitute false, fraudulent, or misleading statements or representations. The Board also heard lengthy testimony from Dr. Feldman himself regarding his decision to use the phrase "fat melting shots" and his explanation regarding the public's inability to understand more scientific terms. Dr. Feldman also presented testimony from his other experts that basically covered the information that was excluded from Dr. Chubaty's deposition. Dr. Boehm testified about the phrase "fat melting shots" being an oversimplification designed to appeal to patients in an understandable way. Dr. Rotunda testified that he had reviewed Dr. Feldman's advertisements, and he opined that the ads did not make any false promises. With regard to the phrase "fat melting shots," Dr. Rotunda explained that "melting" was a lay term used to make the ads more understandable because patients probably would not understand terms like "lipolysis, ablation, [or] necrosis," which would truly describe the mechanism of mesotherapy. Dr. Rotunda also stated that the lay public does not appreciate medical terms, so the idea is to express things in everyday language. The Board also heard Dr. Langsdon's testimony that he considered Dr. Feldman's advertisements to be okay. In sum, we find that the ALJ did not abuse her discretion in excluding the two questions and responses from Dr. Chubaty's deposition testimony, but in any event, we also conclude that the exclusion of this evidence did not affect the merits of the Board's decision. *See* Tenn. Code Ann. § 4-5-322(i).

Next, Dr. Feldman claims that the ALJ erroneously excluded the following testimony by Dr. Rotunda:

> Q.    I think that [Dr. Feldman] made reference to two sticks of butter in some of his advertising. That a loss could be achieved comparable to two sticks of butter in conjunction to ketogenic diet. I think with – four sticks of butter would be one pound.
>       Would that be a reasonable – would that be a reasonable illustration for the lay public?
> A.    I think so.
> Q.    From what you have told me, you say that the lay public does not appreciate medical terms, but the idea is to express things in everyday

> language that the lay public does understand?
> A.    Exactly.
> Q.    And would that be appropriate, in your opinion?
> A.    I think it is.

From our review of the record, however, the ALJ specifically ruled that the first two questions and answers quoted above *were admissible*, and this portion of the deposition testimony was in fact read into the record before the Board. The only portion of the quoted testimony that was excluded by the ALJ was the last question regarding whether Dr. Rotunda considered "that" to be appropriate, and his response, "I think it is." Again, we find that the ALJ did not abuse her discretion in excluding this testimony, and the exclusion of this question and response did not affect the merits of the Board's decision.

Finally, Dr. Feldman argues that the ALJ abused her discretion in granting the State's motion to exclude these portions of testimony and in denying his request for a continuance due to the procedural posture of the case when the motions were heard. Dr. Feldman points out that the motions were filed "shortly before the third day of trial" and heard "on the last day of trial." He contends that he was unfairly prejudiced by the ALJ's "late ruling" in that he was required to go forward "with what was left" of his proof "without any opportunity to seek replacement proof." Considering all of the facts and circumstances of this case, however, we do not find that the ALJ abused her discretion or acted arbitrarily. It is true that the State did not file its motion in limine regarding Dr. Rotunda's testimony until January 16, 2008, which was after the first two days of the proceedings had taken place, and approximately one week before the third and final day of the proceedings. However, Dr. Rotunda's deposition had just been taken, on behalf of Dr. Feldman, on December 19, 2007, after the first two days of proceedings had occurred.[4] Counsel for the State explained at a hearing that occurred on January 16 that he would be filing the motion that day and that he had not even received a copy of the December 19 deposition from the court reporter until the previous Friday, January 11. Because the ALJ was going to be out of town, she indicated at the January 16 hearing that the motion in limine would be heard the morning of the third day of the proceedings, and counsel for Dr. Feldman did not object or express any problem with that arrangement.

As for the State's motion regarding Dr. Chubaty, it was originally filed on October 30, 2007, after the first day but prior to the second day of the proceedings. Dr. Feldman filed a response on November 6, 2007. At the beginning of the second day of the proceedings, on November 7, the ALJ indicated that she did not have a copy of the motion and response, but

---

[4] The State had filed a motion to compel regarding the taking of Dr. Rotunda's deposition in August of 2007.

she said that she would like to get the issue settled and suggested that the attorneys could explain their positions to her. After other matters were addressed, the issue was raised again, and counsel for Dr. Feldman said that he had a copy of the motion and response for the ALJ to review. However, he then indicated that it was unlikely that he would be introducing Dr. Chubaty's deposition on that day, and the following exchange occurred between counsel for Dr. Feldman and the ALJ:

> Counsel: We might want to get Dr. Chubaty's – get the motion *in limine* some other time.
>
> The ALJ: Well – but I don't want to interfere with your trial strategy. I can be ready to do this when you need it.
>
> Counsel: I guess what I was saying, Judge, if you'd like, since we're coming back with Dr. Rotunda [on the third day], we could go ahead and do these three depositions and then maybe some other time take up that motion *in limine* before we come back with Rotunda, and just put Chubaty and Rotunda together?
>
> The ALJ: Okay. Let's do that. If that works for you?
>
> Counsel: Yes. I think that will work.

After that hearing on November 7, counsel for the State filed a motion to withdraw the motion in limine on December 17, 2007. However, counsel for the State later became ill, and another attorney proceeded on behalf of the State. At the hearing before the ALJ on January 16, 2008, counsel for the State indicated that he wished to renew the motion in limine regarding Dr. Chubaty's testimony, with no changes to the substance of the motion. Counsel for Dr. Feldman stated, "I remember seeing the previous motion in limine. I can't – most of the items that the State wanted to exclude we weren't going to read anyway." He indicated that it would probably be unnecessary to hear part of the motion, and after the ALJ explained that she would be out of town, counsel expressed no disagreement with the motion being heard on the morning of the third and final day of the proceedings.

Counsel for Dr. Feldman filed a written response to both motions the day before the hearing, in which he responded to the substance of the motions in limine but also requested a continuance, arguing that "denying [him] the full content of his expert witness depositions at this late stage of the trial would effectively 'cut the heart out' of his defense and result in a prejudicial and unjust adjudication." When hearing the motions, the ALJ pointed out that Dr. Feldman had been aware of the bases of the State's objections to Dr. Chubaty's testimony since the date of his deposition on August 3, 2007, because counsel for the State objected to the testimony at that time. In addition, the ALJ was prepared to hear the Chubaty motion on the second day of the proceedings, on November 7, 2007, and it was counsel for Dr. Feldman who suggested that the motion be heard at a later date. Although the motion was later

-20-

withdrawn and renewed in its same form, counsel for Dr. Feldman was present and did not object when the ALJ indicated that she would hear the motion on the morning of the third day, and he even indicated that some of the issues would likely be resolved by the parties. It was not until the day before the hearing that Dr. Feldman claimed that hearing the motions on the last day of the proceedings would "cut the heart out" of his defense. As for the motion concerning Dr. Rotunda's testimony, the State filed its motion just days after receiving a copy of the deposition. Considering all of the procedural circumstances involved, in addition to the fact that Dr. Feldman only challenges the exclusion of three questions and responses on appeal, we find no abuse of discretion in the ALJ's refusal to grant a continuance.

## 2. Testimony regarding the Standard of Care

Dr. Feldman also argues on appeal that the ALJ erred in excluding other testimony from his experts. Prior to the hearings before the Board, the State had filed a motion requesting that Dr. Feldman be precluded from introducing certain testimony from Dr. Rotunda and Dr. Chubaty regarding the standard of care for the use of mesotherapy. The State argued that because these doctors were licensed to practice medicine only in the states of California and Arizona, respectively, they could not testify regarding the applicable standard of care pursuant to Tennessee Code Annotated section 29-26-115(b). Dr. Feldman filed a response, arguing that the requirements of section 29-26-115 were inapplicable to proceedings before the Board. The ALJ concluded that the contiguous state rule of Tennessee Code Annotated section 29-26-115 did apply in proceedings before the Board, but that it was only applicable in this case to the issue of gross or repeated malpractice. Accordingly, the ALJ ruled that the testimony of Drs. Rotunda and Chubaty was not admissible for the purposes of addressing the gross or repeated malpractice charge, but that their testimony regarding the remaining charges was admissible. Counsel for Dr. Feldman asked the ALJ about her ruling as follows:

Counsel: Judge, is your ruling saying if our experts – if our experts do not venture an opinion as to whether or not there's a deviation from the applicable standard of care . . . that they're free to give their opinions – expert opinions as to other matters, other than the deviation from the state standard of care. Is that what you're saying?

The ALJ: Yes. Yes.

. . . .

So from a practical standpoint, it seems to me my ruling would mean that your experts could come in and say what they're going to say, as long as they don't say he breached the standard of care.

On appeal, Dr. Feldman argues that the ALJ abused her discretion in excluding the doctors' testimony that he was not guilty of malpractice and did not depart from the standard of care. In response, the State argues that the exclusion of this evidence did not affect the outcome of the case because the Board ultimately concluded that Dr. Feldman was not guilty of malpractice. Dr. Feldman acknowledges that the Board did not find him guilty of malpractice, but he continues to assert that the exclusion of this evidence "more probably than not affected the [Board's] verdict." Dr. Feldman claims that "[t]here is no other explanation for fining [him]" for 413 instances of violations.

We disagree with Dr. Feldman's contention and find that the Board was authorized to assess a civil penalty against Dr. Feldman for each of his mesotherapy patients even though it did not find him guilty of malpractice. The Board has the power to reprimand or take such action in relation to disciplining a licensee "as the board in its discretion may deem proper[.]" Tenn. Code Ann. § 63-6-214(a)(4). In addition, the Board may assess a civil penalty against a licensee "in an amount not to exceed one thousand dollars ($1,000) for each separate violation of a statute, rule or order pertaining to such board[.] Each day of continued violation constitutes a separate violation." Tenn. Code Ann. § 63-1-134(a); *see also* Tenn. Comp. R. & Regs. § 0880-02-.12(1)(h) (stating that the Board may impose a civil penalty separately or in addition to other discipline upon finding that a licensee has violated any provision of the Tennessee Medical Practice Act).

Here, the State had originally sought the imposition of a $500 type B penalty[5] for each day that Dr. Feldman maintained his advertising claims regarding mesotherapy. The Board found that Dr. Feldman had advertised mesotherapy between June 2004 and March 2006, which, by our estimation, would include approximately 630 days. However, the Board ultimately decided to assess 413 separate type B civil penalties against Dr. Feldman in the amount of $100 per penalty, with 413 representing the number of patients upon whom he had performed mesotherapy. Dr. Feldman does not cite any authority for his position that the Board was not authorized to assess a monetary penalty in this manner, and we have found none. It is important to note that Dr. Feldman concedes that the Board had the authority to fine him for deceptive advertising. He simply challenges the Board's decision to fine him based on the number of patients to whom he provided mesotherapy. Dr. Feldman was obviously advertising his mesotherapy practice for the purpose of making a profit. We do not find it arbitrary or capricious under the facts of this case for the Board to impose a monetary penalty against Dr. Feldman based on the number of patients to whom he provided the advertised service, especially in light of the fact that the Board was authorized to assess

---

[5] A type B civil penalty of $100 to $500 may be imposed whenever the Board finds a licensee "guilty of a violation of the Medical Practice Act, or regulations promulgated pursuant thereto, in such a manner as to impact directly on the care of patients or the public." Tenn. Comp. R. & Regs. § 0880-02-.12(4)(b).

a penalty for every day that the advertising took place. *See* Tenn. Code Ann. § 63-1-134(a) ("Each day of continued violation constitutes a separate violation."). In sum, we conclude that the Board was authorized to penalize Dr. Feldman in the manner that it did, and the Board's decision does not indicate that it was implicitly punishing him for malpractice. Consequently, we agree with the State's contention that the ALJ's decision to exclude the experts' testimony regarding the issue of malpractice did not affect the outcome of the case. Because the alleged error would be harmless in any event, we will not consider the issue. *See* Tenn. R. App. P. 36.

## C. Consideration of the Disciplinary History

Finally, Dr. Feldman raises various issues regarding the Board's consideration of his past disciplinary history. Prior to the beginning of the proceedings before the Board, Dr. Feldman filed a motion in limine requesting that the ALJ exclude any evidence of prior charges and disciplinary action against him on the basis that it was irrelevant and that its probative value was substantially outweighed by the danger of unfair prejudice. Dr. Feldman had been disciplined by the Board on three prior occasions. In 1997, the Board had found Dr. Feldman guilty of unprofessional, dishonorable, or unethical conduct for numerous instances of inappropriate conduct involving patients and staff. For example, the Board found that Dr. Feldman had threatened and screamed at a TennCare patient, made inappropriate comments during patients' pelvic exams, made sexually suggestive remarks about female staff members and patients, had sexual intercourse with a seventeen year old patient, told another patient that "there was nothing more he could do for her and that she could put a gun in her mouth and pull the trigger," and exchanged medical treatment, prescriptions, and/or medications for sex with female workers at a massage parlor. The Board's 1997 disciplinary order placed Dr. Feldman's license on probation for one year, assessed a $2,500 civil penalty, and ordered Dr. Feldman to report back to the Board with evidence that he had obtained the advocacy of a physician in the Physicians' Health Program. In 1998, the Board found Dr. Feldman guilty of unprofessional conduct and violation of a Board order based on his failure to comply with the previous disciplinary order by failing to obtain the advocacy of the aforementioned physician and failing to report back to the Board. The 1998 order placed Dr. Feldman's license on probation for five years, assessed a $2,000 penalty, and required his compliance with additional conditions. In 2001, the Board found Dr. Feldman guilty of an advertising violation because he advertised his weight loss program through post cards that offered a fifty percent discount to patients who brought a "diet buddy" to their next visit, in violation of a regulation that prohibited a physician from offering material consideration for the referral of patients. Dr. Feldman was assessed a $1,000 penalty and ordered to remain on probation. The five-year probation was lifted in September 2003.

The State opposed Dr. Feldman's motion to exclude the evidence but requested that the disciplinary history only be presented to the Board in the disciplinary phase of the proceedings, after the Board had made its decision regarding the current charges against him. Following a hearing, the ALJ denied Dr. Feldman's motion to exclude the disciplinary history, but ruled that in order to avoid prejudice, the disciplinary history would only be presented to the Board after the resolution of the current charges. On the third day of the proceedings before the Board, after the Board had announced its decision that it found Dr. Feldman guilty of the various violations, the Board was provided with copies of the prior disciplinary orders entered against Dr. Feldman. The ALJ then provided instructions to the Board that it could not "reassess" any previous disciplinary action, and that it could only consider the disciplinary history as part of its determination of the appropriate discipline, if any, for the violations in this case.

Dr. Feldman argues on appeal that it was error for the ALJ to permit consideration of his disciplinary history at any stage of the proceedings because the history was irrelevant and unduly prejudicial. The UAPA provides a somewhat relaxed standard regarding the admissibility of evidence in a contested case hearing:

> The agency shall admit and give probative effect to evidence admissible in a court, and when necessary to ascertain facts not reasonably susceptible to proof under the rules of court, evidence not admissible thereunder may be admitted if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs. The agency shall give effect to the rules of privilege recognized by law and to agency statutes protecting the confidentiality of certain records, and shall exclude evidence which in its judgment is irrelevant, immaterial or unduly repetitious.

Tenn. Code Ann. § 4-5-313(1). In **Robertson v. Tenn. Bd. of Social Worker Certification & Licensure**, 227 S.W.3d 7, 14 (Tenn. 2007), our Supreme Court considered whether it was appropriate for the Board of Social Worker Certification and Licensure to consider a licensee's 1982 felony convictions for forgery, which occurred fifteen years before her licensure as clinical social worker in 1997, when the Board considered a 1999 charge that the social worker had an improper personal relationship with a client. The Court concluded that the felony convictions were irrelevant and should not have been considered, stating that the fact that the social worker, "while abusing drugs and alcohol twenty years earlier, forged three checks to support a drug habit, [was] not probative of her 1999 professional conduct," especially in light of the fact that the Board had already considered the convictions when deciding whether to grant her a license. **Id.** However, the Court stated that it wished to "emphasize the narrowness of [its] holding," explaining:

We have merely determined that, under the evidentiary rules that apply to UAPA adjudicative hearings, evidence of Robertson's *pre*-licensure conduct that was entirely unrelated to her 1999 misconduct and that the Board specifically considered in conjunction with its 1997 decision to grant her a license was improperly a part of the Board's deliberations. In this case, Robertson's offenses were committed *prior to* her licensure and therefore before any duty to abide by the regulations applicable to social workers. Had Robertson committed the felonies *after* licensure, their consideration might have been relevant in crafting the appropriate remedy, regardless of whether they were probative of whether she committed the infraction with which she was charged.

*Id.* at 14-15 (emphasis in original) (footnote omitted).

In another case similar to the one before us, involving proceedings before the Board of Medical Examiners, the ALJ instructed the Board that the physician's "disciplinary history could only be considered for determining appropriate sanctions if and in the event the Board found Dr. Rich in violation of any of the statutes or regulations at issue." ***Rich v. Tennessee Bd. of Medical Examiners***, No. M2009–00813–COA–R3–CV, 2010 WL 3565668, at *5 (Tenn. Ct. App. Sept. 14, 2010) *perm. app. granted* (Tenn. Mar. 10, 2011). When challenged on appeal, the Court found no error in the procedure, and citing ***Robertson***, stated that "Dr. Rich's prior disciplinary action was appropriate for consideration of sanctions following the finding that he was in violation of the charged statutes and regulations."[6]

We likewise find that Dr. Feldman's lengthy disciplinary history was relevant to the Board's decision regarding the appropriate remedy to be imposed in this case, regardless of whether it was probative of whether he committed the infractions with which he was charged. We also find that the ALJ minimized the potential for undue prejudice by ruling that the evidence could only be introduced at the disciplinary phase of the proceedings. We therefore conclude that the ALJ did not abuse her discretion in handling this matter.

Next, Dr. Feldman argues that the Board unlawfully disregarded the ALJ's instruction that it should not reassess or repunish Dr. Feldman based on the previous disciplinary actions. He points to the following comments, made during the Board's deliberations by one of the Board members:

---

[6] Because the Court reversed the Board's finding on three of the seven charges against the physician, the Court ultimately remanded the case for the reconsideration of the sanctions against the physician. ***Rich***, 2010 WL 3565668, at *1.

Dr. White:      I think I'll – I think I'll start out.  As I – had I been sitting on this first case, which was the 21st and 22nd days of January, 1997, I would have voted at that time for a permanent revocation of the license.  I think the violations on the medications are very egregious.  And I honestly don't think that Dr. Feldman should have practiced medicine since that date.

           This says in 1983, and I know we're not supposed to consider this for disciplinary action today, but in 1983 you had sex with a minor and then had some other violations that went along with that same sort of thing.  Which I consider very egregious, and had I been sitting on at that time [sic] – or at that time I would have voted for a permanent revocation.

The ALJ:       Are you asking me to comment on that?

Dr. White:      No.  I'm just – I'm making a statement to the rest of the Board.  I just think that that was very egregious.  Both were very egregious occurrences, and I don't think he should have been practicing medicine since 1997.

           Now we can hear from the rest of the Board.

The ALJ:       I just ask that you keep my instructions in mind.

Dr. White:      I agree, and I thank you.

Another Board member then commented that he approved of revoking Dr. Feldman's license for one year and assessing a monetary penalty of $41,300, and he stated that he was basing his decision not on the past but "strictly on the evidence that has been filed" in this case.  The third Board member then noted that Dr. Feldman had clearly exhibited unprofessional, dishonorable, and unethical conduct, in addition to committing the numerous other violations involving false statements, and stated that the Board had a duty to protect the health, safety, and welfare of the people of Tennessee.  Dr. White then stated:

       And I apologize for making a pre-existing statement about the previous actions.  But I know Dr. Cunningham [another Board member] very well, and I'm surprised that he let it pass, too.

       But that being beside the point, I feel like I agree that all but one or two of the things that we went over were true and violations of the medical practice act, and I feel like this is an adequate punishment to sort of get the attention of the Respondent, and I agree.

Dr. Feldman argues that Dr. White's comments indicate that he disregarded the ALJ's instructions and intended to "re-punish" Dr. Feldman for his past conduct.  Dr. Feldman suggests that this is the only explanation for the Board's decision to revoke his license "for

just a handful of advertising violations." We are unable to conclude, however, that Dr. White's statements indicate such a motive. As previously discussed, the Board was authorized to consider Dr. Feldman's disciplinary history, which necessarily involves a consideration of the nature of past offenses and the effectiveness of prior disciplinary measures that were imposed. Although Dr. White stated his opinion that Dr. Feldman's license should have been revoked during the 1997 proceedings, he did not suggest that a permanent revocation was appropriate in the instant case. He also stated, "I know we're not supposed to consider this for disciplinary action today," and when the ALJ mentioned her previous instruction, Dr. White stated, "I agree." Dr. White later recognized that his thoughts about the previous actions were "beside the point." He went on to discuss the violations at issue in this case and his opinion that the proposed punishment would "get the attention of" Dr. Feldman. Considering all of the circumstances, we decline to interpret the statements of this one Board member as an indication that the Board's decision was arbitrary and capricious.

When reviewing only an agency-imposed remedy, "'[t]he appropriate remedy is peculiarly within the discretion of the [agency].'" *Robertson*, 227 S.W.3d at 13 (quoting *McClellan v. Bd. of Regents of State Univ.*, 921 S.W.2d 684, 693 (Tenn. 1996)). As such, "we will only review whether the remedy is 'unwarranted in law' or 'without justification in fact.'" *Id.* at 14 (quoting *Mosley*, 167 S.W.3d at 321). "Courts are not to substitute their judgment as to an appropriate sanction for that of the agency responsible for enforcement." *City Towing & Transport, Inc. v. Transp. Licensing Comm'n of Metro. Gov't of Nashville & Davidson County*, No. M2007-01246-COA-R3-CV, 2009 WL 276761, at *4 (Tenn. Ct. App. Feb. 3, 2009) (citing *Robertson*, 227 S.W.3d at 16). Because we find that the Board's chosen sanction was warranted in law and justified in fact, we affirm its decision in all respects.

## V.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court upholding the order of the Board of Medical Examiners. Costs of this appeal are taxed to the appellant, Richard W. Feldman, M.D., and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.
