Jean Louise MILLER

v.

**TENNESSEE BOARD OF NURSING.**

Court of Appeals of Tennessee,
at Nashville.

Oct. 13, 2006 Session.

Sept. 26, 2007.

Opinion Denying Petition for Rehearing
Oct. 22, 2007.

Permission to Appeal Denied by
Supreme Court April 7, 2008.

226

This appeal involves a disciplinary proceeding against a registered nurse. After receiving a report that a registered nurse left her patients in a hospital's medical/surgical unit before the end of her shift, the Tennessee Board of Nursing commenced a contested case proceeding to discipline the nurse. Following the hearing, the Board ordered the nurse to pay a $1,000 civil penalty and also immediately suspended the nurse's license pending a psychological evaluation. The nurse sought judicial review of the Board's decision by the Chancery Court for Davidson County, and the trial court affirmed the Board's finding that the nurse had abandoned her patients, the assessment of the civil penalty, and the immediate suspension of the nurse's license. The nurse appealed. We have determined that the record contains substantial and material evidence that the nurse abandoned her patients and that the Board did not act arbitrarily by requiring the nurse to pay a $1,000 civil penalty. However, we have determined that the Board acted arbitrarily when it immediately suspended the nurse's license pending a psychological examination in the absence of any evidence or finding that the nurse was presently mentally unfit to practice nursing.

I.

Jean Louise Miller worked as a licensed practical nurse for five years before she completed nursing school and became licensed as a registered nurse in Pennsylvania in 1988. For the next fifteen years, Ms. Miller led a nomadic existence, practicing as a registered nurse in Pennsylvania, Virginia, Florida, New Jersey, Connecticut, Maine, Oklahoma, and finally Tennessee. She never worked very long at any particular job. She characterizes herself as a "traveling nurse," and she has

Jean Louise Miller, Nashville, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter, and Sara E. Sedgwick, Assistant Attorney General, for the appellee, Tennessee Board of Nursing.

OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

frequently worked for staffing agencies that would find her temporary assignments at different institutions and locations.

Ms. Miller moved to Tennessee in 1997. Between June 1997 and May 2000, she worked at five different hospitals in the Nashville area. In February 2002, while employed at a home health agency, Ms. Miller became convinced that several of her paychecks had been stolen and reported the thefts to the Metropolitan Police Department. She got into a disagreement with the police officer to whom she was reporting these thefts. After she tore up the report and spit in the officer's face, she was charged with the misdemeanor offenses of vandalism and resisting arrest. She was briefly incarcerated and later entered a conditional plea of guilty in the Metropolitan Nashville General Sessions Court and was placed on probation under Tenn.Code Ann. § 40–35–313 (2006).

Her arrest, incarceration, and conviction affected Ms. Miller significantly. She testified that she felt "defenseless" and that she became "deliberately paranoid." She feared that the police were tapping her telephone and keeping her under surveillance. Accordingly, she explained that she "lost a lot of sleep" and was "stressed out" because she was convinced that she would be returned to jail if she was arrested again while on probation. Ms. Miller sought counseling and treatment following the incident but eventually decided to "work it out" herself at home because she was not satisfied with the treatment she was receiving. According to Ms. Miller, she eventually completed her probation satisfactorily. However, Ms. Miller did not present any evidence to demonstrate that her record was, in fact, expunged in accordance with Tenn.Code Ann. § 40–35–313(a).

The incident that precipitated this dispute took place on April 15, 2002. Ms. Miller was working for the Starmed Staffing Group ("Starmed"), and, in January 2002, she had been contracted for thirteen weeks to the Cookeville Regional Medical Center. She was working on the 7:00 p.m. to 7:00 a.m. shift on the hospital's med/surg unit.[1] That night, Ms. Miller was responsible for four to five patients with differing conditions. One patient had chronic obstructive pulmonary disease; one was recovering from surgery; and one was a prenatal patient who required monitoring of her fetal heart tones. While Ms. Miller reported that all of her patients were stable, she was concerned about the prenatal patient because she had been trying unsuccessfully since the beginning of her shift to have someone from obstetrics listen to the fetal heart tones.

Ms. Miller began to feel ill between 4:30 and 5:00 a.m. She entered the staff bathroom and vomited. The vomit, nausea, and stomach pain led her to suspect that she had gastritis because she had had the condition before. She left the bathroom and walked to the nurse's station. There she informed the other four nurses on duty in the med/surg unit that night that she was ill and that she was leaving the hospital to go home. The charge nurse instructed her to find the supervisor and report that she was leaving the hospital before the end of her shift.

Ms. Miller left the floor and got on the elevator. However, while she was on the elevator, she decided that she would not inform the supervisor that she was leaving

1. A medical/surgical or "med/surg" unit provides care to patients recovering from a wide variety of medical conditions, including those recovering from diagnostic, therapeutic, or surgical interventions, those hospitalized for acute conditions, and those who may be in the final stages of progressive and chronic disease.

the hospital. Ms. Miller was concerned that the supervisor would instruct her to go to the emergency room. She did not want to go to the emergency room because she had already decided to see her personal physician in Nashville and because she was concerned that she would not be able to pay for a visit to the emergency room. Accordingly, Ms. Miller simply left the hospital without talking with anyone else.

She testified later that, as she left, she was not concerned about any of her patients, except for the prenatal patient whose fetal heart tones had not been monitored before she left. She believed that the patients would not require much care before the end of her shift, and that the other nurses could take care of them because they were not busy. Ms. Miller was satisfied that the written notes in her patients' charts would adequately acquaint the hospital staff with the status of her patients and the care they had received during her shift. She also decided that the other nurses knew that she had been trying to have someone monitor the fetal heart tones of the prenatal patient and that they would follow up on that procedure as well.

The following day, Cookeville Regional Medical Center informed Starmed that it was terminating Ms. Miller's contract, and Starmed, in turn, informed Ms. Miller than her services were no longer required. In addition, Cookeville Regional Medical Center reported Ms. Miller to the Tennessee Board of Nursing ("Board"). On November 1, 2002, the Division of Health Related Boards of the Tennessee Department of Health ("Division") filed a written notice of charges against Ms. Miller. The Division charged that Ms. Miller should be disciplined because she was "guilty of a crime" based on her conditional guilty pleas to vandalism and resisting arrest and because she was mentally incompetent and had engaged in unprofessional conduct.

The Board conducted a contested case hearing on June 27, 2003. Ms. Miller represented herself during the proceeding. Following the submission of the evidence, the Board concluded that Ms. Miller was guilty of a crime in violation of Tenn.Code Ann. § 63–7–115(a)(1)(B) (2004) and had engaged in unprofessional conduct by abandoning or neglecting a patient requiring nursing care in violation of Tenn.Code Ann. § 63–7–115(a)(1)(F) and Tenn. Comp. R. & Regs. 1000–2–.13(1)(c) (2006). The Board made no findings with regard to Ms. Miller's mental competency. Based on these findings, the Board suspended Ms. Miller's license to practice nursing "pending a psychological evaluation of Respondent's suitability to practice nursing" and ordered her to pay a $1,000 civil penalty and costs.

Ms. Miller sought judicial review of the Board's decision in the Chancery Court for Davidson County. Ms. Miller represented herself during this proceeding, as she had in the proceedings before the Board. On August 16, 2005, the trial court filed a memorandum and order concluding that Ms. Miller had "walked out before the end of her nursing shift at Cookeville Regional Medical Center, disobeying the charge nurse who instructed her to notify a supervisor that she was leaving." The court, like the Board, concluded that "once Ms. Miller accepted the job at Cookeville Regional Medical Center and accepted the role of caretaker for the patients on her shift, she was bound by her statutory and regulatory duty to care for them or make sure that others assumed the caretaker role before she left." Accordingly, the trial court affirmed the Board's conclusion that Ms. Miller had engaged in unprofessional conduct in violation of Tenn.Code

Ann. § 63–7–115(a)(1)(F) and Tenn. Comp. R. & Regs. 1000–2–.13(1)(c).

The trial court also expressed concern regarding the adequacy of the Division's evidence that Ms. Miller had committed a crime and the inelasticity of the penalty for violating Tenn.Code Ann. § 63–7–115(a)(1)(B). In light of its conclusion that the record contained substantial and material evidence that Ms. Miller had abandoned her patients when she left work early, the trial court declined to rule on the issue of whether Ms. Miller was "guilty of a crime" under the nursing statutes. Ms. Miller has perfected this appeal.

### II.

Judicial review of decisions by administrative agencies following contested case hearings is governed by the Tennessee Uniform Administrative Procedures Act. Tenn.Code Ann. § 4–5–322(a)(1) (2005). Trial and appellate courts use the same standard of review. *Gluck v. Civil Serv. Comm'n,* 15 S.W.3d 486, 490 (Tenn.Ct.App. 1999); *Ware v. Greene,* 984 S.W.2d 610, 614 (Tenn.Ct.App.1998). When the factual support for an administrative decision is challenged, the courts must examine the entire record to determine whether the decision is supported by substantial and material evidence. Tenn.Code Ann. § 4–5–322(h)(5).

■ The substantial and material evidence standard requires a searching and careful inquiry into the record to determine the basis for the administrative decision. *Sanifill of Tenn., Inc. v. Tenn. Solid Waste Disposal Control Bd.,* 907 S.W.2d 807, 810 (Tenn.1995); *Willamette Indus., Inc. v. Tenn. Assessment Appeals Comm'n,* 11 S.W.3d 142, 147 (Tenn.Ct.App. 1999). In these cases, the courts do not reweigh the evidence or substitute their judgment for that of the administrative agency. *McClellan v. Bd. of Regents,* 921

S.W.2d 684, 693 (Tenn.1996); *Humana of Tenn. v. Tenn. Health Facilities Comm'n,* 551 S.W.2d 664, 667 (Tenn.1977); *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n,* 876 S.W.2d 106, 111 (Tenn.Ct. App.1993). Instead, they review the record for such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration. *Clay County Manor, Inc. v. State,* 849 S.W.2d 755, 759 (Tenn.1993); *Southern Ry. Co. v. State Bd. of Equalization,* 682 S.W.2d 196, 199 (Tenn.1984); *Papachristou v. Univ. of Tenn.,* 29 S.W.3d 487, 490 (Tenn.Ct.App.2000).

■ We may not reverse an administrative decision supported by substantial and material evidence solely because the evidence could also support another result. *Hughes v. Bd. of Comm'rs,* 204 Tenn. 298, 305, 319 S.W.2d 481, 484 (1958); *Metropolitan Gov't v. Tenn. Solid Waste Disposal Control Bd.,* 832 S.W.2d 559, 561 (Tenn.Ct. App.1991). Courts may reject an administrative agency's factual findings only if a reasonable person would necessarily draw a different conclusion from the record. *Jones v. Greene,* 946 S.W.2d 817, 828 (Tenn.Ct.App.1996).

### III.

Ms. Miller, continuing to represent herself on this appeal, insists that the trial court erred by determining that the evidence supports the Board's conclusion that she abandoned patients requiring nursing care when she left work before the end of her shift on April 15, 2002. She also asserts that the record does not support the Board's conclusion that she was "guilty of a crime."

### A.

■ We turn first to the most serious charge against Ms. Miller—patient aban-

donment. As defined in the Board's rules, patient abandonment occurs when a nurse abandons or neglects a patient requiring nursing care. The record also contains a revised "position statement" issued by the Board in December 2002 drawing a distinction between patient abandonment and "employment abandonment." This document states:

For patient abandonment to occur, the nurse must:

a) Have first *accepted* the patient assignment, thus establishing a nurse-patient relationship, and then

b) *Severed* that nurse-patient relationship without giving reasonable notice to the appropriate person (e.g., supervisor, patient) so that arrangements can be made for continuation of nursing care by others.

A nurse-patient relationship begins when responsibility for nursing care of a patient is accepted by the nurse.

There is no dispute that Ms. Miller accepted the obligation to care for four to five patients when she reported for work at Cookeville Regional Medical Center's med/surg unit. While the Division presented no evidence regarding the specific care that Ms. Miller's patients required, the nature of the unit provides a basis for concluding that the patients required care during Ms. Miller's shift. In fact, Ms. Miller herself stated that her patients required care that night and that she had provided all the care they required until the time she left the hospital.

The Division also failed to present evidence that Ms. Miller's patients required care between the time she left the hospital and the end of her shift. This oversight could potentially pose a problem for the Division because, based on the Board's rule, patient abandonment cannot occur unless the patient "requires care." However, Ms. Miller cured the deficiency in the Division's evidence when she stated that her patients would have required the administration of medications and the prenatal patient required monitoring of her fetal heart tones between the time she left the hospital and the end of her shift. In light of Ms. Miller's concession, the record contains substantial and material evidence that her patients still required nursing care when she left the hospital.

The final question is whether Ms. Miller inappropriately severed the nurse-patient relationship when she left the hospital before the end of her shift. This question is answered by reviewing the essentially undisputed facts in light of the Board's revised position statement. A nurse can be found to have abandoned a patient if the nurse severs the nurse-patient relationship without giving reasonable notice to the appropriate person so that arrangements can be made for the continuation of nursing care by others. When Ms. Miller became ill, she told the other nurses on the unit, including the charge nurse, that she was leaving the hospital. The charge nurse informed her that she must inform a supervisor that she was leaving the hospital, but Ms. Miller purposely decided not to tell the supervisor that she was leaving.

The record thus contains clear and convincing evidence that the appropriate person for Ms. Miller to notify that she was leaving before the end of her shift was the supervisor. Ms. Miller was informed of this policy, but she chose to ignore it. In light of Ms. Miller's admission that she did not notify the supervisor that she was leaving before the end of her shift, the record contains substantial and material evidence that she severed her relationship with her patients without giving reasonable notice and, therefore, that she abandoned her patients when she left the hospital.

## B.

The Board also found that Ms. Miller was "guilty of a crime" as proscribed by Tenn.Code Ann. § 63–7–115(a)(1)(B). While Ms. Miller conceded that she pled guilty to vandalism and resisting arrest, she insists that the Board could not consider either of these offenses because her record was expunged following the successful completion of her probation. The trial court decided that it was not required to review this finding because it had already concluded that Ms. Miller had abandoned her patients.

Despite the trial court's avoidance of the issue, we will address the adequacy of the evidence supporting the Board's conclusion that Ms. Miller was guilty of a crime for the purpose of Tenn.Code Ann. § 63–7–115(a)(1)(B).[2] Even though she claimed that her circumstances forced her to plead guilty, Ms. Miller admitted that she pled guilty to vandalism and resisting arrest. Her primary defense was that these convictions had been expunged and that the effect of the expunction was to clear her record.

Ms. Miller is correct with regard to the legal effect of an expungement order; however, she failed to present admissible evidence that the public records of these two convictions for minor expenses had been expunged. The effect of expunging the records of a criminal charge is to restore the person to the position he or she occupied prior to the arrest or charge. *State v. Sims,* 746 S.W.2d 191, 199 (Tenn. 1988). Thus, persons whose records have been expunged may properly decline to reveal or acknowledge the existence of a former charge. *Pizzillo v. Pizzillo,* 884

S.W.2d 749, 754 (Tenn.Ct.App.1994). While Ms. Miller testified that the records regarding the vandalism and resisting arrest charges had been expunged, she failed to present evidence supporting her claim. In the absence of the corroborating evidence that the records regarding her two convictions had been lawfully expunged, Ms. Miller's testimony that she had pled guilty to vandalism and resisting arrest provide the substantial and material evidence needed to support the Board's conclusion that Ms. Miller was "guilty of a crime" for the purpose of Tenn.Code Ann. § 63–7–115(a)(1)(B).

## C.

The Division initially charged that Ms. Miller was "mentally incompetent" for the purpose of Tenn.Code Ann. § 63–7–115(a)(1)(E). However, it did not proceed with this charge at the administrative hearing and thus presented no evidence of any sort regarding Ms. Miller's psychological fitness to practice nursing. The only evidence in the record regarding Ms. Miller's fitness to practice nursing consisted of three reports prepared in 2003 and 2004 that failed to point to any basis for concluding that Ms. Miller was "mentally incompetent."

The Board, like the trial court and this court, had an opportunity to observe Ms. Miller's demeanor and to read the voluminous papers she prepared. These observations may very well have provided grounds for concern about Ms. Miller's stability and fitness. However, the observations of a regulatory board, even a board made up of persons with relevant expertise, cannot replace competent evidence.

---

**2.** Ms. Miller has only taken issue with the sufficiency of the evidence supporting the Board's conclusion that she was guilty of a crime. She has not challenged this statutory ground for vagueness or overbreadth, and she

has not raised any due process challenges to the statute. Accordingly, our review is limited to determining the sufficiency of the evidence under Tenn.Code Ann. § 4–5–322(h)(5).

*Martin v. Sizemore*, 78 S.W.3d 249, 269–71 (Tenn.Ct.App.2001) (expert evidence was required to support discipline of an architect for malpractice). Thus, as this record stands, it lacks any evidence at all that Ms. Miller is "mentally incompetent" to practice nursing.

## IV.

As a final matter, Ms. Miller asserts that the Board acted arbitrarily and capriciously by suspending her nursing license pending a psychological evaluation of her suitability to continue to practice nursing and by requiring her to pay a civil penalty and costs. For its part, the Board asserts that its punitive and remedial actions with regard to Ms. Miller are carefully calibrated and entirely supported by the evidence.

### A.

In its original notice of charges, the Board sought a $1,000 civil penalty for Ms. Miller's abandonment of her patients as proscribed by Tenn. Comp. R. & Regs. 1000–1–.13(1)(c). After considering the evidence introduced at the contested case hearing, the Board found that Ms. Miller had indeed abandoned her patients when she left the hospital before the end of her shift without informing the supervisor. This finding is supported by substantial and material evidence, and, therefore, the Board did not act arbitrarily when it ordered Ms. Miller to pay a $1,000 civil penalty and costs.[3]

### B.

The Division's original notice of charges included an assertion that Ms. Miller was

"mentally incompetent" and requested, in general terms, the Board to determine "whether ... [her] license should be suspended or revoked and/or whether other discipline should be imposed." However, the Division did not present any evidence regarding Ms. Miller's psychological status during the hearing, and the Board's order contains no findings of fact or conclusions of law regarding Tenn.Code Ann. § 63–7–115(a)(1)(E). Instead, the Board noted that

> the series of events that have occurred with the Respondent have caused her great emotional and mental stress to the point where it did interfere with her ability to perform her job appropriately; for not coming in for certain shifts and also for leaving. This stress did interfere with work in the past and the Board wants to make sure that doesn't happen again.

Invoking its authority to protect the health, safety, and welfare of the citizens of Tennessee, the Board thereafter suspended Ms. Miller's nursing license pending a psychological examination arranged through Tennessee Peer Assistance and directed that the results of this evaluation be forwarded to its application committee for further recommendations regarding the suspension of Ms. Miller's license.

The Board's immediate suspension of Ms. Miller's nursing license was triggered by its concerns regarding her psychological condition, not by the abandonment of her patients or by her criminal convictions. However, in light of the absence of any evidence or factual findings regarding Ms. Miller's current psychological condition, we

---

3. Ms. Miller is laboring under the mistaken belief that the civil penalties specified in the Board's order and then in the trial court's memorandum and order are cumulative and that she now owes $3,000 in civil penalties. The only civil penalty imposed by the Board, which has been affirmed by the trial court and now by this court is for $1,000. In addition to the civil penalty, Ms. Miller also must pay the costs of the proceeding in accordance with Tenn.Code Ann. § 63–7–115(d) and Tenn. Comp. R. & Regs. 1000–1–.04.

have concluded that the Board acted arbitrarily and capriciously by immediately suspending her license as part of this disciplinary proceeding. While the Board has the statutory authority to require nurses to submit evidence of nursing competence, including satisfactory physical and mental health, before the renewal of their registration,[4] it does not have the statutory authority, in the absence of evidence that supports a finding that a nurse's psychological condition renders the nurse unfit to practice nursing, to summarily suspend a nurse's license pending a psychological examination.

## C.

The Division's original notice of charges requested that two $500 civil penalties be assessed against Ms. Miller for her guilty pleas and convictions for vandalism and resisting arrest. Even though the Board determined that Ms. Miller was guilty of two crimes, it decided not to require Ms. Miller to pay the civil penalties requested by the Division. We have already determined that the record contains substantial and material evidence supporting the Board's conclusion that Ms. Miller was guilty of vandalism and resisting arrest. Ms. Miller's belief that the Board imposed monetary penalties against her for committing these two crimes is mistaken. The only financial penalty imposed by the Board was the $1,000 penalty for patient abandonment. We certainly do not find that the Board erred by declining to assess a civil penalty against Ms. Miller for committing these two offenses.

## V.

Like the trial court, we affirm the Board's finding that Ms. Miller abandoned

her patients and the Board's decision requiring her to pay a $1,000 civil penalty and the costs of the administrative proceeding. We have also concluded, however, that the Board acted arbitrarily and capriciously by ordering the immediate suspension of Ms. Miller's nursing license pending a psychological evaluation. We remand the case with directions to the trial court to remand the case to the Board for further proceedings consistent with this opinion. We tax the costs of this appeal to the Tennessee Board of Nursing.

## OPINION DENYING PETITION FOR REHEARING

WILLIAM C. KOCH, Jr., P.J., M.S.

The Tennessee Board of Nursing has filed a petition in accordance with Tenn. R. App. P. 30 requesting a rehearing in this case. The Board requests this Court to revisit the conclusion in our September 26, 2007 opinion that is lacked authority to suspend Ms. Miller's nursing license pending a psychological evaluation in the absence of an competent evidence that Ms. Miller was psychologically impaired. Specifically, the Board asserts that a "long, rambling letter" written by Ms. Miller provides an ample evidentiary basis for it conclusion that Ms. Miller's license should be suspended pending a psychological examination. The Board also asserts that it has the authority to impose "sanctions that go beyond any sanctions requested by the Division."

The Division of Health Related Boards made that strategic decision to address its concerns regarding Ms. Miller's psychological condition in the context of a disciplinary hearing. It asserted that Ms. Miller should be disciplined in accordance with

---

4. *See* Tenn.Code Ann. § 63-7-114(a) (Supp. 2006); Tenn. Comp. R. & Regs. 1000-1- .03(1)(a) (2006).

Tenn. Code Ann. § 63-7-115(a)(1)(E) (2004) because she was mentally incompetent. However, nowhere in its notice of charges did the Division request that Ms. Miller's license be suspended because she was psychologically impaired.[1] During the contested case hearing, the Division presented no evidence, in the form of expert opinions, that Ms. Miller was psychologically unfit to practice nursing.

The Board clearly has the statutory authority to revoke or suspend a nurse's license on the ground that the nurse is not psychologically competent to practice nursing. However, its ability to do so is governed by the fundamental tenets of due process, the adequacy of the Division's notice of charges, and the competent evidence presented during the contested case hearing. Procedural due process required a government entity to employ fundamentally fair procedures whenever it acts to deprive a person of a right to or interest in life, liberty, or property. *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994 (1972); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 309 (Tenn. 2005).

The right to engage in one's chosen profession or occupation without unreasonable government interference or deprivation is both a property and a liberty interest protected by the Due Process Clause of the Fourteenth Amendment and Article I, Section 8 of the Constitution of Tennessee. *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959); *McNiel v. Cooper*, 241 S.W.3d 886, 895

(Tenn. Ct. App. 2007). In its most general terms, procedural due process requires appropriate notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Manning v. City of Lebanon*, 124 S.W.3d 562, 566 (Tenn Ct. App. 2005). In cases of this sort, appropriate notice includes not only notice of offending conduct but also notice of the penalties being sought. See *Maskaron v. Dep't of Prof'l Regulation*, 450 So.2d 1242, 1244 (Fla. Dist. Ct. App. 1984) (setting aside the five-year suspension of a physician's license when the notice of charges referred only to probation); *Bd. of Med. Exam'rs v. Schutzbank*, 94 Ariz. 281, 383 P.2d 192, 193-94 (1963) (setting aside the revocation of a physician's license because of notice of hearing referred only to a suspension).

Based on our examination of the Division's notice of charges, we concluded in our September 26, 2007 opinion that the notice did not fairly appraise Ms. Miller that the Division was seeking either the revocation or the suspension of her nursing license. The only remedies specifically requested by the Division were (1) civil penalties linked with specific causes of action and (2) the costs of the proceeding. We also concluded in our September 26, 2007 opinion that the Division presented no competent evidence regarding Ms. Miller's psychological condition.[2] Thus, in light of the shortcomings in the Division's notice of charges and the factual deficiencies in the Division's case, the Board could not, at least in this proceeding, suspend Ms. Mil-

---

1.  The Division noted that the Board has the authority to revoke or suspend a license for mental incompetency, but it did not specifically request this punishment.

2.  The Division argues for the first time in its petition for rehearing that a "long, rambling letter" written by Ms. Miller provides ample evidence that she is sufficiently psychologically impaired to be suspended from nursing. While the letter proves Ms. Miller has not mastered the fine points of the rules of grammar and spelling, the mere length, organization, and content of the letter provided insufficient basis for concluding that Ms. Miller is unfit to practice nursing. Many lawyers and judges would not rest easily if they thought that the length, organization, and content of their writings provided a basis to question their psychological competence.

ler's license pending a psychological evaluation.

The Board's petition for rehearing is respectfully denied.