# IN THE COURT OF APPEALS OF TENNESSEE
# AT KNOXVILLE
## March 6, 2012 Session

## OUTDOOR RESORTS AT GATLINBURG, INC. v. UTILITY MANAGEMENT REVIEW BOARD ET AL.

**Appeal from the Chancery Court for Sevier County**
**No. 09-11-501    Telford E. Forgety, Jr., Chancellor**

---

**No. E2011-01449-COA-R3-CV-FILED-APRIL 13, 2012**

---

Webb Creek Utility District ("WCUD") is a public utility district that, for the most part, furnishes potable water to its customers and processes their sewage. One of its customers is the plaintiff, Outdoor Resorts at Gatlinburg, Inc., the operator of a large campground for campers and recreational vehicles ("RVs"). Outdoor is somewhat unique in that it has its own water supply. It is a "sewer only" customer. From 1985 until 2008, the rate WCUD charged Outdoor was set by contract, which either party could terminate with sufficient notice. In 2008, WCUD terminated the contract and notified Outdoor that it would be charged based upon the number of campsites multiplied by a standard minimum rate per campsite. Outdoor objected to the rate. WCUD held a hearing and adopted the proposed rate over Outdoor's objection. Outdoor asked for a hearing before the Utility Management Review Board ("the UMRB"). While the matter was pending before the UMRB, WCUD conducted a rate study, following which it proposed still another rate for Outdoor that was less than the objected-to rate, but more than the rate Outdoor had been paying under the terminated contract. The UMRB approved the new rate. Outdoor demanded a refund of overpayments made by it under the higher rate; the UMRB denied Outdoor's request, stating that it lacked authority to order a refund. Outdoor also asked the UMRB to compel the individual who prepared the rate study to appear for a deposition. The UMRB denied the discovery request upon concluding that it did not have the authority to order such a deposition. Outdoor sought review in the trial court by way of a common law writ of certiorari on several grounds, including lack of material evidence to support the new rate, denial of due process in not compelling a deposition, and its characterization of UMRB's action as illegal and arbitrary. The trial court allowed Outdoor to take the deposition of the author of the rate study; the court later admitted the deposition testimony into evidence. Nevertheless, the court concluded that the UMRB's decision was supported by material evidence and dismissed Outdoor's complaint. Outdoor appeals. We hold that Outdoor was not denied due process, but we vacate the trial court's judgment because we hold that neither the first post-contract rate established by WCUD nor the newly adopted rate approved by the

UMRB is supported by material evidence. Further, we conclude that the UMRB had authority to order a refund of the overpayments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated; Case Remanded with Instructions**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

L. Marshall Albritton and Jessica Van Dyke, Nashville, Tennessee, for the appellant, Outdoor Resorts at Gatlinburg, Inc.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Ann Louise Vix, Senior Counsel; and Joe Shirley, Senior Counsel, Nashville, Tennessee, for the appellee, Utility Management Review Board.

James L. Gass and Matthew L. Fink, Sevierville, Tennessee, for the appellee, Webb Creek Utility District.

**OPINION**

I.

Outdoor operates a vacation campground in Gatlinburg. There are 376 campsites in the campground. Each campsite has sewer access. In addition to the campsites, Outdoor has an estimated eight additional sewer feeds from the office and amenities for a total of 384. Until 1985, Outdoor processed its own sewage. In 1985, Outdoor entered into a customer contract with WCUD. To achieve the connection, WCUD installed a manhole close to the boundary of the campground, and Outdoor ran a trunk-line from its existing system to the manhole. Outdoor is responsible for all maintenance on the system up to the point of connection to WCUD. There is no meter for the individual campsites, and there was no meter at the manhole until about the time this dispute began. Under the 1985 contract, Outdoor was billed for 400 campsites at a set rate per campsite. As of February 2008, the rate per site was $21.86 ("the Contract Rate"). Outdoor's monthly bill was $8,744.

In February of 2008, WCUD gave Outdoor notice that it was terminating the 1985 contract. It is undisputed that WCUD had the right to do so. This dispute involves, rather, the legality of billing rates instituted by WCUD upon termination of the contract. WCUD began billing Outdoor at a rate of $45.54 per campsite, multiplied by 384 sites. The new rate was based on the minimum monthly rate charged to individual customers, such as residential

customers, for a single sewer service. The effect was to increase Outdoor's monthly bill from $8,744 to $17,487.36, just 64 cents short of doubling the bill.

Outdoor objected to the new billing rate of $45.54 and asked for a hearing pursuant to Tenn. Code Ann. § 7-82-402(a)(1)(2011).[1] At Outdoor's request, WCUD's board of commissioners held a hearing on Outdoor's challenge. The proof at that hearing established that, at the time of the hearing, no "cost-of-service" or "rate study" had been performed for WCUD as a basis for its charges to customers. The rates had been adjusted in 2004 based on what was necessary to service WCUD's debt on its combined water and sewer operations. WCUD experienced losses in 2005 as a result of losing several large customers, partially as a result of the impact of a slowed economy on the local tourism industry. In that same time frame, WCUD was declared a "financially distressed" utility and instituted a new schedule of rates as part of a financial recovery plan.[2] Up until approximately six months before the hearing, there had been no measurements made of the flow into WCUD's sewer system from Outdoor's trunk-line. Because, Outdoor is a "sewer-only" customer, there is no way to determine its usage without measuring the flow into WCUD's system at the connection point. WCUD's consulting engineer admitted that the new rate was not based on usage. It was

---

[1] The statute as codified in 2011 remains unchanged from 2008. It provides:

> Within thirty (30) days of the date on which the statement [of the water rates being charged] provided for in § 7-82-401 is published, any water user of the district may file with the commissioners of the district a protest, giving reasons why, in the opinion of the water user, the rates so published are too high or too low. Within a period of fifteen (15) days after the end of this thirty-day period during which such protest may be filed, the commissioners shall notify each such protestant of a hearing to be held by the commissioners on such protests as may have been filed within the thirty-day period prescribed. Upon the hearing date so fixed, which shall be some date within a period of sixty (60) days after giving such notices to the protestants, all such protests shall be heard together by the commissioners. After hearing and examining statements, exhibits and arguments of the protestants or their counsel, the commissioners shall make and spread upon the minutes of the commission their finding as to the reasonableness or unreasonableness of the published rates, and, at the same time, the commission may increase or decrease such rates upon a finding that they are too low or too high, as the case may be.

[2] WCUD's consultant testified that upon becoming financially distressed, WCUD was legally required to formulate a recovery plan. *See* Tenn. Code Ann. § 7-82-403 (2011)(rates must be sufficient for the utility to pay expenses and debts).

based on the belief that it was fair to charge Outdoor the same rate per campsite as the minimum rate for residential users.

Outdoor's expert testified that it was unfair to charge Outdoor the same rate for each campsite as for each residential user. Rather, because Outdoor's collection system is self-contained and maintained entirely by Outdoor, the expert testified that the rate should be a "wholesale" rate. Further, Outdoor's expert testified that, in his professional opinion, a utility district cannot set a fair and reasonable rate without performing a cost-of-service study. Outdoor's expert also believed that the sewer-only customers were being charged unfairly to subsidize the water customers because the water operations had consistently lost money and the sewer operations, at least until 2004, had generated money. WCUD's commissioners voted to overrule Outdoor's challenge and continue billing at the rate of $45.54 per unit.

Outdoor exercised its statutory right, pursuant to Tenn. Code Ann. § 7-82-702(7)(2011),[3] to challenge WCUD's rate determination before the UMRB. The UMRB held its first of several hearings on February 5, 2009. It allowed each side 20 minutes to present its case. In addition to the evidence presented in the hearing before WCUD's commissioners, Outdoor presented evidence that it was being treated differently from other campgrounds. Arrow Creek Campground had 60 campsites, but it was charged only for three connections. It has three water meters. Smoky Bear Campground has 31 campsites, but it is charged based on two water meter connections. Outdoor's expert testified that, based upon the flow data gathered for Outdoor, it was being overcharged; it was receiving less than 50% of the service for which it was paying. One aspect of this was the nature of Outdoor's sewer usage through campsites that are often vacant, especially in the winter months. WCUD again admitted that no formal cost-of-service study had been performed but offered evidence of its budget constraints as justification for the rates being charged. WCUD also presented evidence that throughout Outdoor's existence, Outdoor had experienced "in-flow" problems, meaning that ground water flows into Outdoor's system during times of heavy rainfall. This water

_____

[3]The statute grants the UMRB the

power and authority to:

* * *

Review any decision of any utility district under § 7-82-402 . . . upon simple written request of any utility district customer or any member of the public within thirty (30) days after such decision, with any judicial review of any decision of the board thereon, to be held by common law certiorari within the county of the utility district's principal office.

-4-

becomes part of WCUD's treatment burden. In fact, according to witnesses presented by WCUD, in-flow problems, including Outdoor's in-flow, was the reason WCUD's plant was forced to expand in 2004 and incur significant debt.

Based on the agreement of the parties, the UMRB voted to defer its decision and encouraged the parties to work toward a possible resolution, including the discussion of a rate study.

The parties next came before the UMRB on April 2, 2009. WCUD announced that it was proceeding with a rate study and that it had chosen a company to perform the study. Outdoor requested that the UMRB reinstate the Contract Rate while the study was being performed and that the UMRB direct the company conducting the rate study to consult with Outdoor's expert. The UMRB denied both requests and rescheduled the matter for its August meeting.

WCUD submitted its rate study in advance of the August meeting. Outdoor requested and was granted a continuance to allow its expert to review the rate study. The final hearing before the UMRB was held on October 1, 2009. The chairman announced that each side would be given 10 minutes to argue the merits of its position "so we don't re-litigate the case." Neither party objected to the time constraint. The focus of the hearing was the recently conducted rate study. The rate study recommended an increase in the minimum charge for *residential users* from $45.54 to $59.41 with an additional usage charge of $8.84 per thousand gallons for usage above 3000 gallons. The study determined that usage per unit by Outdoor was only approximately 62.5 % of the usage of a residential customer. Therefore, the study recommended treating Outdoor as a "luxury campground" to be billed at a new rate of $37.13 per month with an additional usage charge of $8.84 per thousand gallons for usage above 1,650 gallons.

Outdoor attacked the study as being based on flawed financial information and flawed usage data. The usage data for Outdoor's campground was based on readings from a flow meter WCUD installed in February 2008. The data included the time frame of February 2008 through May 2009. However, at the instruction of WCUD, the preparer of the study excluded five months of data that reflected the lowest usage for Outdoor, those being the months of November 2008 through March 2009. This was despite WCUD's determination, as stated in the minutes of its April 2009 meeting, that the meter was accurately reporting flow on 30 minute intervals. WCUD installed a new meter in May 2009 that began recording usage significantly higher than the previous meter. As to the financial figures underlying the rate study, Outdoor pointed out that there was no substantiation in the study of the fixed versus variable costs and of sewer versus water operations. Outdoor also objected to an unexplained financial reserve account created for the sewer operations. There

was no such account created for the water operations. Outdoor further objected that it had asked to take the deposition of the consultant who had prepared the rate study but WCUD had refused to make the consultant available. Outdoor requested that the UMRB issue a subpoena compelling the consultant to appear and give a deposition. Outdoor did not ask that the expert be compelled by subpoena to appear at the hearing.

To counter Outdoor's objections to the flow data, WCUD proposed that the UMRB approve the new rate structure but "delay the implementation of the volume charge based on the lack of sufficient, reliable historical flow data that would be necessary to implement such a charge." In the course of asking for the adoption of the new rate, WCUD acknowledged that the $45.54 rate was "arbitrary" but suggested that the Contract Rate was also arbitrary and that the proposed rate would be a step "in the right direction." Outdoor requested a return to the Contract Rate and for a refund of that portion of the payments made by it that exceeded the Contract Rate.

The UMRB denied Outdoor's request for a deposition. It stated:

> The UMRB is authorized to subpoena persons to appear at hearings before the UMRB; but the UMRB finds that it does not have the authority, when hearing a complaint under Tenn. Code Ann. § 7-82-702(7), to require the parties to participate in discovery, including to appear at depositions to be conducted outside the hearing.

Also, the UMRB found "that it does not have the authority to order refunds to customers in connection with its review of a protest under Tenn. Code Ann. § 7-82-702(7)." The UMRB approved the application of the new minimum rate of $37.13 to Outdoor effective January 1, 2010, and delayed "the adoption of the volume charge to [Outdoor] for wastewater flows until sufficient, reliable flow data can be obtained."

Outdoor filed a timely petition in the chancery court for a common law writ of certiorari. The chancery court allowed Outdoor to take the deposition of the consultant who prepared the rate study, "to discover any information that the [UMRB] acted arbitrarily, capriciously or illegally, not only information relating to bias or corruption." Outdoor took the deposition of the consultant, Mr. Bart Kreps. Mr. Kreps confirmed that the flow data was limited and that some data was excluded at the direction of WCUD. He also admitted that the rate study included large unexplained sewer cost increases. He also testified that the data underlying the study was not contained in the study itself, including any documentation regarding allocation of fixed and variable costs and allocation of costs between water and sewer operations. Further, Mr. Kreps testified that without reviewing additional data that

was not contained in the rate study, a person could not determine that the rate set for Outdoor was just and reasonable.

The trial court dismissed Outdoor's petition in an order that incorporated a memorandum opinion transcribed from the court's bench ruling. Among other things, the court held that the denial of discovery did not violate procedural due process and that the rate study alone supplied material evidence to support the UMRB's decision. Outdoor filed a timely notice of appeal.

## II.

The issue, as stated verbatim in Outdoor's brief is

> whether the Chancery Court . . . erred when it failed to find that the [UMRB] acted illegally, arbitrarily, or without material evidence when it (1) affirmed sewer service rate increases charged by [WCUD] to [Outdoor], (2) failed to find that [Outdoor] had been charged an unjust and unreasonable rate for a period of time and was entitled to a refund, and (3) denied [Outdoor] the right to discover the underlying support and basis for the rate study that [WCUD] presented to the [UMRB] in support of its second rate study.

## III.

The method of judicial review of a decision of the UMRB is "by common law certiorari." Tenn. Code Ann. § 7-82-702(7). In *Harding Academy v. Metropolitan Government of Nashville and Davidson County*, 222 S.W.3d 359 (Tenn. 2007), the Supreme Court stated the following:

> This writ provides a limited scope of review by the courts. Review of [a board's] action in this case is limited to determining whether the board exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision. In proceedings involving a common law writ of certiorari, illegal, arbitrary, or fraudulent actions include: 1) the failure to follow the minimum standards of due process; 2) the misrepresentation or misapplication of legal standards; 3) basing

a decision on ulterior motives; and 4) violating applicable constitutional standards. . . .

Our review is limited to the record produced by the [board] unless the reviewing court has permitted the introduction of additional evidence on the issue of whether the board exceeded its jurisdiction or acted illegally, capriciously, or arbitrarily. We may not reweigh the evidence, examine the intrinsic correctness of the decision being reviewed, or substitute our judgment for that of the local officials. If no evidence supports the action of the administrative board, then that action is arbitrary. . . .

*Id.* at 363 (citations omitted). An agency decision that is not supported by substantial and material evidence is, by definition, arbitrary and capricious. *Jackson Mobilphone Co. v. Tennessee Public Service Comm'n*, 876 S.W.2d 106, 110 (Tenn. Ct. App. 1993)(*citing* *C.F. Indus., Inc. v. Tennessee Public Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980); *Pace v. Garbage Disposal Dist. of Washington County*, 54 Tenn. App. 263, 266, 390 S.W.2d 461, 463 (1965)). We review an administrative agency's determination on an issue of law de novo, with no presumption of correctness. *Harding*, 222 S.W.3d at 363.

We must make a "searching and careful inquiry into the record" to determine whether the administrative decision is supported by substantial and material evidence. *Miller v. Tennessee Board of Nursing*, 256 S.W.3d 225, 229 (Tenn. Ct. App. 2007). We may reject the administrative agency's "factual findings only if a reasonable person would necessarily draw a different conclusion from the record." *Id*. Stated another way, we are allowed to consider all proof "that fairly detracts from the agency's decision," but we still may not reverse the agency if there is evidence "which a reasonable mind might accept to support a rational conclusion and which furnishes a reasonably sound basis for the action being reviewed." *Ruff v. Neeley*, No. W2006-01192-COA-R3-CV, 2006 WL 3734641 at *7 (Tenn. Ct. App. W.S., filed Dec. 20, 2006).

IV.

A.

We will begin with the issue of whether the trial court erred in affirming the UMRB's determination that it lacked authority to order a refund of overpayments. The question of whether the UMRB lacked authority to order a refund is a question of law that we review de novo. *See **Harding Academy***, 222 S.W.3d at 363. We hold that the UMRB did, in fact, have authority to order a refund of overpayments made while Outdoor's challenge was pending.

-8-

The legislature has explicitly granted the UMRB the "power and authority" to "[r]eview any decision of any utility district under § 7-82-402 [with regard to a utility district's rates and charges]." Tenn. Code Ann. § 7-82-702(7). It may "[e]xercise all the powers and take all the actions necessary, proper or convenient for the accomplishment of [that purpose]" and other enumerated purposes. *Id*. at (11). The only cases offered to support the proposition that the UMRB is without power to order a refund of over-billings are *A.A.R.P. v. Tenn. Public Service Comm'n*, 896 S.W.2d 127 (Tenn. Ct. App. 1994) and *South Bell Telephone Co. v. Tenn. Public Service Comm'n*, 675 S.W.2d 718 (Tenn. Ct. App. 1984). Both cases stand for the proposition that an administrative utilities board does not have authority "to order refunds *except* in very limited circumstances." *A.A.R.P.*, 896 S.W.2d at 134 (emphasis added) (*citing South Bell Telephone*, 675 S.W.2d at 718). The present case falls within one of those exceptions as it was explained in *South Bell Telephone*. A board retains inherent power over monies collected under rates that

> were made effective for the period while the case was pending
> before the board and before final judgment of the board. A
> similar order by a court would be termed a "pendente lite" order.

*South Bell Telephone*, 675 S.W.2d at 719. The present matter first came before the UMRB on Outdoor's challenge of the $45.54 rate per campsite. Even though the UMRB did not approve the rate or explicitly adopt it as a "pendente lite" or "temporary" rate, by its deferral of action it allowed collections at that rate. There was never a time that Outdoor agreed to the $45.54 rate. Thus, we hold that this case falls within the powers explicitly granted to the UMRB and within a recognized exception to the general rule against refunds.

Outdoor seeks a refund of "the difference between the $45.54 rate and the rate that had been negotiated previously," *i.e.*, the Contract Rate. Even though the chairman of WCUD admitted that the $45.54 rate was arbitrary, UMRB argues that it was fair and reasonable to refuse a refund because it would not be fair and reasonable to order a refund based on the Contract Rate. We agree that any refund should not be based upon the Contract Rate. Once WCUD terminated the contract, Outdoor lost any right to pay based on that rate. Just as there is no evidence to support the fairness and reasonableness of the $45.54 rate, there is no evidence to support the fairness and reasonableness of the Contract Rate. The refund must be based upon a fair and reasonable rate, whatever that is determined to be.

B.

We move now to Outdoor's contention that it was denied due process by the Board's refusal to issue a subpoena compelling the deposition of Mr. Kreps. Outdoor concedes that due process is not necessarily a perfect, or error-free process, and agrees that the basic

requirement is the opportunity to be heard "at a meaningful time and in a meaningful manner." ***Mathews v. Eldridge***, 424 U.S. 319, 333 (1976)(*quoting **Armstrong v. Manzo***, 380 U.S. 545, 552 (1965)). Outdoor asserts "[t]hat did not happen in this case." The process that is "due" varies with the situation. ***Id***. at 334; ***Phillips v. Board of Regents***, 863 S.W.2d 45, 50 (Tenn. 1993). In ***Phillips***, the Supreme Court noted:

> In determining what process is due in a particular situation, three factors must be considered: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

***Id.*** at 50 (citing ***Mathews***, 424 U.S. at 335). "Moreover, [the court may consider whether] the component parts of the process are designed to reach a substantively correct result. Elaborate procedures at one stage may compensate for deficiencies at other stages." ***Id***. (citation omitted).

Under the above guidelines, it is clear to us that Outdoor's due process argument is without merit. First, we note that Outdoor could clearly have asked to have Mr. Kreps subpoenaed to appear and answer questions at the final hearing. It is true that the UMRB limited the parties to 10 minutes per side at the final hearing, but the record does not reflect any objection by Outdoor to the time limitation. Even though Outdoor was denied discovery before the UMRB, it was allowed discovery in the trial court. Both stages are part of the "process" defined by the statutory scheme; thus, the more elaborate procedures in the trial court ultimately allowed Outdoor to have its questions answered. Moreover, Outdoor does not have a vested interest in any particular rate structure. ***Consumer Advocate Division v. Bissell***, No. 01-A-01-9601- BC00049, 1996 WL 482970 at *4 (Tenn. Ct. App. M.S., filed Aug 28, 1996). "Ratemaking is a legislative function." ***Id***. The "private interest affected" for Outdoor is simply the right to a fair and reasonable rate based on material evidence subject to review as provided in Tenn. Code Ann. § 7-82-702(7). In short, without deciding whether or not the UMRB had the power to order Mr. Krebs to sit for a deposition, we hold that the failure to so order did not violate Outdoor's due process rights.

C.

We consider now the final question of whether or not the revised rate of $37.13 per site for 384 sites is based on material evidence. The parties agree that the rates set by a public utility must be "just and reasonable." *CF Industries v. Tennessee Public Service Comm'n*, 599 S.W.2d 536, 542 (Tenn. 1980), *see* Tenn. Code Ann. § 7-82-403 ("district shall prescribe and collect reasonable rates"), § 7-82-702(19) (UMRB to review "the justness and reasonableness of fees or charges").

The initial hearing before the UMRB, held on February 5, 2009, concerned only the reasonableness of the $45.54 rate per campsite. The new rate of $37.13 was strictly a product of the rate study. It was first considered by the UMRB in the October hearing. There was no testimony explaining the rate study. None of the underlying documentation was supplied to the UMRB. Thus, the UMRB's approval of the rate of $37.13 was necessarily based on the rate study alone. The trial court held that the rate study alone constitutes material evidence. We agree that this is normally true, but the record before us in this case will not allow that conclusion here. The person responsible for preparing the rate study, Mr. Kreps, made the following concessions in his deposition which we have paraphrased for brevity:

> It is not just and reasonable for a customer to be charged rates that exceed their cost-of-service or usage.
>
> The projected maintenance and operation costs of WCUD's sewer operations for 2010 reflect an increase of more than 50% from the costs recorded in 2009 – $199,434 for 1999 versus $304,925 for 2010. There is nothing in the study to show that an increase of this magnitude is reasonable or reasonably allocated. The UMRB, or anyone reviewing the data for that matter, would have to assume that the increased costs were reasonably incurred and reasonably allocated.
>
> If he were doing a review for a customer to determine whether the rate being charged to the customer was just and reasonable, he would want supporting documentation for the rate study, including individual cost items. He would not be willing to simply assume that the underlying data justified the conclusions.
>
> The study supplied to the UMRB does not include enough information to allow a person reviewing the study alone to determine (1) the cost allocation between water and sewer, (2)

-11-

the allocation of fixed and variable costs, and (3) budget items such as cost of labor, material, and insurance.

The flow data supplied by WCUD was "one of the chief components for determining the rate" for Outdoor. It was the basis for concluding that Outdoor's usage was 62.5 percent of a residential customer. He was instructed by WCUD to exclude several months of flow data, including November and December 2008 and January 2009. He assumed that the exclusion was because of an in inaccurate meter but the data that was ultimately used came from the same meter. It would concern him to base a rate study on data obtained from an inaccurate flow meter. He was unwilling to testify that the nine months of data was sufficient basis for a rate study; it "would be reasonable [for a customer such as Outdoor] to want to see multiple years of data."

Outdoor is the only "luxury campground" in the WCUD system. The 384 services for which it is being charged is greater than the number of total connections within WCUD's system. Outdoor is not receiving administrative, billing or maintenance services for the 384 campsites for which it is being billed. Outdoor is being treated different from other customers in that it is being billed for its "inflow and infiltration" from groundwater since it is being charged based on a meter that records flow into WCUD whereas other customers are being charged based on water usage and a system average.

In addition to these concessions, we note that other campgrounds are not being billed according to the number of campsites. Arrow Creek has approximately 60 campsites but it is receiving only 3 bills based on the number of water meters. Smokey Bear campground is being billed for two water meters even though it has over 30 campsites.

WCUD and the UMRB urge us to defer to the experience and expertise of the members of the UMRB. They suggest that, because of the collective experience and expertise of the members of the UMRB, they would know whether the figures used in the rate study are within the range of reasonable. "However, the observations of a regulatory board, even a board made up of persons with relevant expertise, cannot replace competent evidence." *Miller*, 256 S.W.3d at 231.

We conclude that the decision of the UMRB to adopt the new rate of $37.13 for Outdoor effective January 1, 2010 is not supported by material evidence. The evidence that fairly detracts from the study includes the testimony of the preparer of the rate study which shows that any reasonable customer who has serious concerns about his or her sewer bill would not be satisfied without seeing the data that underlies the study. Further, it is clear that Mr. Kreps was not by any means comfortable with the limited flow data. WCUD virtually conceded that the flow data was unreliable and that more reliable data is needed. Further proceedings before the UMRB to determine a just and reasonable rate will be necessary after sufficient flow data is gathered. We are not holding that $37.13 per site is an unreasonable or unjust rate. That is not our responsibility in reviewing this case. We are simply holding that the rate study alone, which was the only evidence before the UMRB upon which the rate could have been confirmed, does not constitute material evidence in light of the evidence from the study's creator and other evidence, all of which detracts from accepting it at face value.

Our conclusion creates the need for some guidance as to what will happen with regard to billing until sufficient flow data is gathered to support a reliable rate study. We will address this issue pursuant to Tenn. R. App. P. 36 (a) which allows us to "grant any relief" demanded by the case subject to some limitations not applicable here. The rate of $45.54 was arbitrary, as we have concluded, so Outdoor will not be billed based on this rate. We have further held that Outdoor will be entitled to a refund of the difference between the $45.54 rate and whatever is eventually determined to be a just and reasonable rate from the time it was instituted to the time WCUD adopted the rate of $37.13 on January 1, 2010.[4] From January 1, 2010, until such time as the UMRB approves a new rate structure as just and reasonable, Outdoor shall be billed at the temporary, or "pendente lite" rate of $37.13. If the new rate approved by the UMRB is less than the temporary rate, WCUD shall refund to Outdoor the difference in the amount billed and the amount owed. If the new rate is higher than the temporary rate, Outdoor shall pay WCUD the difference in the amount billed and the amount owed.

V.

The judgment of the trial court is vacated. Costs on appeal are taxed to Webb Creek Utility District. This matter is remanded to the trial court for further proceedings consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE

---

[4]We are assuming that the new rate will be less than $45.54. In the event we are wrong, the UMRB may consider whether Outdoor will be responsible to pay the difference.